# THE MAMIE.

(*District Court, E. D. Michigan.* January 24, 1881.)

**1.** LIMITED LIABILITY ACT—STEAM PLEASURE YACHT CHARTERED FOR HIRE.

The owners of a small steam pleasure yacht, engaged in navigating the Detroit river, running in and out of the port of Detroit, *held*, not entitled to the benefits of the limited liability act, although at the time of the loss, out of which the cause of action arose, she was chartered to a third person for hire. It is only vessels engaged in what is ordinarily known as maritime commerce, which are subject to the provisions of this act, and the facts that they are duly enrolled, licensed, and inspected, and are otherwise subject to the navigation laws of the United States, are immaterial.

In Admiralty. On petition of owners for limitation of liability.

The petition amended set forth—*First*, that petitioners are and were, at the time of the collision hereinafter mentioned, the sole owners of the steam-yacht Mamie, a vessel enrolled and licensed for the coasting trade, and engaged in commerce and navigation between ports and places in different states and territories, and foreign countries, upon the great lakes, and the navigable waters connecting the same. *Second*, that on the evening of July 22, 1880, a collision occurred in the Detroit river between the Mamie, then on a trip and carrying passengers from Monroe to Detroit, in the state of Michigan, and the steam-boat Garland, also an enrolled and licensed vessel, and engaged in the same commerce. *Third*, that in consequence of such collision the Mamie was sunk and became a total wreck, and seventeen passengers were drowned. *Fourth*, that such collision and loss of life were not caused by the design or neglect of the petitioners, or either of them, but the same happened, and the loss, damage, injury, and loss of life resulting therefrom were occasioned, without the design, neglect, fault, or privity of the petitioners or either of them; wherefore, they claim a limitation of liability as provided in the Revised Statutes, and offer to pay into court the value of their interest in the Mamie and her freight, pending

at the time of the collision, or to give a stipulation with sureties for the payment thereof. *Fifth,* that they also desire to contest their liability and that of the Mamie for the loss of life occasioned by said collision, independent of the limited liability act. *Sixth,* that the Mamie was seaworthy, and properly manned and equipped. *Seventh,* that one James H. Cuddy was appointed, by the probate court of this county, administrator of the estate of the persons whose deaths were occasioned by this collision; that he has commenced suits in the superior court of Detroit against petitioners, as owners of the Mamie, for damages; that, in addition to such suit, petitioners have reason to believe and do believe that other claims on account of such collision will be made against them, and other suits instituted to recover the same, and that each one of said claims will, if established, greatly exceed the value of the Mamie and her freight at the time of the collision.

### PRAYER.

That they may be entitled to the benefit of the limited liability act, etc. And that, until the judgment of this court shall be rendered, the court will make an order restraining the further prosecution of suits against petitioners by Cuddy, and of all other suits in respect to claims arising out of said collision.

To this petition a special plea was filed, denying that the Mamie was engaged in commerce and navigation between ports and places in different states and territories, and foreign countries, as alleged in the first article of the petition, and also averring that she fell within the description of canal-boats, barges, and lighters, excepted from the benefit of the act.

Testimony was taken under this plea regarding the character and employment of the Mamie, and the case was submitted upon these pleadings and proofs.

*F. H. Canfield, Wm. A. Moore,* and *H. H. Swan,* for petitioners.

*H. M. Campbell* and *Alfred Russell, contra.*

BROWN, D. J.   The Mamie was purchased by her present owners in October, 1877, as a steam pleasure yacht.   She was an enrolled and licensed vessel of $15\frac{1}{2}$ tons burden, 51 feet in length, $9\frac{1}{2}$ feet in breadth, and 4 feet deep.   She had one mast, and an engine with a cylinder of eight-inch stroke, no state-rooms or sleeping bunks, but a small cabin in which to carry passengers.   She was used by her owners, who were members of the "Lake St. Clair Shooting and Fishing Club," and was occasionally let for hire to pleasure parties, picnics, and excursions up and down the Detroit river, nearly always upon the American side, and upon two or three occasions she ran down to the Ohio islands in Lake Erie.   Her only regular employment seems to have been in running up to the "club house" on the St. Clair flats on Saturday evenings, returning Sunday evenings, for which a round fare of one dollar was charged.   She had no facilities for and never carried merchandise of any description.   She seems never to have taken a clearance from the custom-house but once, and this upon a trip to Amhurstburg and back.   She was licensed to carry 25 passengers, but generally carried from 8 to 15.   Her crew consisted only of a master and engineer.   Upon the day of her loss she was chartered for $20, by the parish priest of Trinity parish, to carry his acolytes, about 20 in number, upon an excursion to Monroe and back.

The special plea raises the single issue, whether the Mamie belonged to a class of vessels within the scope and purview of the limited liability act.   There are no authorities directly, and but very few remotely, bearing upon the question, and I am compelled to ascertain by analogy, and by an historical reference to this class of legislation, what was the intention of congress.   A limitation of liability is entirely a creature of statute.   At common law the owners of vessels were liable to the same extent for the torts of the master and crew as other principals were for the misfeances of their agents.   Such also appears to have been the case among the ancient maritime nations, since no mention is made of the right of abandonment (which is but another name for a limited liability) among the earliest writers.

The ancient laws of Oleron, Wisby, and the Hanse towns contained no provision on this subject, nor is any alteration of the rule of the civil law noted by Roccus; but Vinnius, an earlier author, states that by the law of Holland the owners were not chargeable beyond the value of the ship and the things that are in it. The Hanseatic ordinance of 1614 had already pronounced the goods of the owner discharged from claims for damage by the sale of the ship to pay them; and in conformity therewith the French ordinance of 1681 declared "that the owners of ships shall be answerable for the acts of the master, but shall be discharged therefrom upon relinquishing their ship and the freight." A similar provision in the ordinance of Rotterdam, made in 1721, declares "that the owners shall not be answerable for any act of the master done without their order, any further than their part of the ship amounts to;" and by other articles of the same ordinance it appears that each part owner is liable only for the value of his own share. Valen, in his Commentaries on the French Ordinance, informs us that the same regulations were also established at Hamburg.

The earliest provision of the British legislature on this subject is a statute passed a few years after the date of the ordinance of Rotterdam, in consequence of a petition presented to the house of commons by several merchants and other persons, owners of ships belonging to the port of London, setting forth the alarm of the petitioners at the event of a late action, in which it was determined that the owners were answerable for the value of the merchandise embezzled by the master.

A ruling of Lord Mansfield, 50 years later, that the owners of a vessel, which had been forcibly robbed of a large amount of specie in the Thames, were liable for the loss, though one of the mariners was accessory to the robbery, sufficed to alarm the ship-owners of London, and upon another petition to the house of commons a second statute was passed, extending protection to owners in case of robbery without the privity of the master or mariners. The protection thus accorded to them was greatly enlarged afterwards by the 53 Geo. III. c. 159; but these various statutes were

repealed in 1854, and the existing law on the subject is now consolidated in the "Merchants' Shipping Acts of 1854 and 1862." McLachlan on Merch. Ship. 110–112.

By the commercial code of France, (article 210,) "every owner of a vessel is civilly responsible for the acts of the master, and bound, as regards the engagements entered into by the latter, in whatever relates to the vessel and the voyage. He can in any case free himself from the above-named obligations by the abandonment of the vessel and freight." All the other commercial codes are constructed after the same model, (Spain, art. 622; Holland, art. 321; Italy, art. 311; Chili, art. 870.) It will be observed that this right of abandonment is not limited to a few cases, as in England and America, but extends to all torts and contracts of the master; but the word "vessel" in this code is limited to *ships and other sea-going vessels*. Its provisions are not applicable to vessels employed in inland navigation, which are especially designated by the name of "boats." Goirand's Code of Com. 244. So Dufour observes, (1 Droit Mar. 121:) "Thus, as a general rule, it appears to me clear, both by the letter and spirit of the law, that the provisions of the second book of the Commercial Code relate exclusively to maritime, and not to fluvial, navigation; that consequently the word 'ship,' when it is found in these provisions, ought to be understood in the sense of a vessel serving the purpose of maritime navigation or sea-going vessels, and not in the sense of a vessel devoted to the navigation of rivers." In 1844 it was held by the court of cassation that fishing vessels were not the subject of bottomry bonds, and that by "sea going vessels," as used in the Code, were to be understood all those, whatever their dimensions and denomination, which, with an equipment and a crew proper to them, formed a special service, or engaged in a particular industry. 1 Dufour, 118.

Another commentator upon the Code, in treating of the right of abandonment, says: "But in that which concerns the responsibility of the owners of *boats*, the rules of the maritime law cease to be applied. Thus the owners of boats

cannot free themselves by an abandonment as against third persons, to whom indemnity is due, by reason of the faults or misdemeanors of the master. The difference is, nevertheless, little justifiable in law, seeing that the reasons which have sufficed to limit the liability of vessel-owners for the act of the captain apply as forcibly with regard to the acts of the master of a steam-boat navigating a river." 1 Hoechster et sacre, Droit Com. 68.

The first English statute upon this subject, passed in the reign of George III., extended generally to all ships and vessels; but in *Hunter* v. *McGown*, 1 Bligh, 573, it was held that lighters were not included, and that the policy of the law limited its application to sea-going vessels. In the merchants' shipping act of 1854 (17 and 18 Vict. c. 104, par. 503) the words "sea going" were expressly used, but in the merchants' shipping amendment act of 1862 (25 and 26 Vict. c. 63) they were omitted. Our own limited liability act was passed in 1851, soon after the decision of the supreme court in the case of *The Lexington*, 6 How. 344, and was modelled after one of the early English acts. State statutes of a similar import had existed for some time in Maine and Massachusetts. The act itself extends in terms to all vessels, and contains no restrictions except such as are specified in the last section. Rev. St. § 4289. This act "shall not apply to the owners of any canal-boat, barge, or lighter, or to any vessel of any description whatsoever, used in rivers or inland navigation." Hence, any vessel not specially named in this exception, is, *prima facie* at least, entitled to the benefit of the act. At the same time, as Mr. Justice Swayne observed in *Jones* v. *The Guaranty & Ind. Co.* 101 U. S. 626, "a thing may be within a statute, but not within its letter, or within the letter, yet not within the statute. The intent of the law-maker is the law." It is perfectly obvious that there must be classes of vessels to which the statute is not applicable, though they are not mentioned in the exception. It was not necessary to except lighters by name, for it had long before been decided in England that lighters were not within the purview of the act. *Hunter* v. *McGown*, 1 Bligh, 573.

The act is limited by the intention of congress in enacting it, which was to encourage commerce and to enable American vessels to compete with those of other maritime nations whose laws extended a like protection to ship-owners. This is again limited by the constitutional provision that the power of congress shall extend only to commerce between states or with foreign countries. Hence, it seems to me that, if the vessel be not engaged in what is ordinarily understood as maritime commerce, she 'is not entitled to the benefit of the act, though she may be an enrolled and licensed vessel, and subject to the navigation laws of the United States. It is true that in some sense navigation is commerce, yet I can readily conceive there may be a class of vessels navigating between states which are not within the act. Sail-boats carrying passengers for hire between places in different states, as between watering places upon the Atlantic coast, as well as skiffs, canoes, and small craft, are examples of this kind. The exceptions in the act itself indicate the intention of congress to restrict its benefits to what is generally known as maritime commerce, though it may also happen to be commerce between the states. They are:

*First.* "Canal-boats." These are ordinarily, though not always, used upon artificial waters, within the limits of a single state.

*Second.* "Barges" were defined by Webster, in his Dictionary of 1851, the year the act was passed, (1) as "pleasure boats, or boats of state, furnished with elegant apartments, canopies, and cushions, equipped with a band of rowers, and decked with flags and streamers, used by officers or magistrates;" and (2) "a flat-bottomed vessel of burden for the loading and unloading of ships." In the latter sense it was undoubtedly used by congress, and in that sense barges are synonymous with lighters, and are used wholly in local navigation. In later years the word has been used to designate a class of large vessels, sometimes costing from $15,000 to $50,000, carrying large cargoes, and depending for their motive power wholly or in part upon steamers, to which they

are attached by tow-lines, and employed to a very large extent in interstate commerce upon the lakes. Whether the owners of such barges would not be entitled to the benefit of the limited liability act, is an open question. Undoubtedly they are within the letter of the exception, but as they are a class of vessels which was unknown at the time the act was passed, it would seem they are not within its spirit. I see no reason in principle why they are not as much within the act as the propellers which furnish them their motive power.

It is possible, however, that the use of the word "barges," in the Revised Statutes of 1873, may indicate an intention on the part of congress to extend the exemption to this class of vessels.

*Third.* "Lighters"—a well-known class of vessels, used in assisting to load and unload other vessels.

*Fourth.* "Vessels, of whatever description, used in rivers or inland navigation." Under this exemption it was held by Judge Drummond, in *The War Eagle,* 6 Biss. 264, that vessels used in navigating the waters of the upper Mississippi were not within the limited liability act, though engaged in interstate commerce.

Now it seems to me clear, from the above exceptions, that congress did not intend the act should apply to vessels engaged in purely local trade, and *a fortiori* to a vessel not built for the purpose of trade, but of pleasure; not run upon any regular route, not engaged in the business of carrying freight or passengers. I do not undertake to say that pleasure yachts, making long voyages upon the lakes or ocean, may not be within the act, but I think pleasure boats, whether propelled by steam or sail, engaged in purely local navigation, running in and out of the same port, though sometimes carrying passengers for hire, fall within the exception. I have not overlooked the case of *The Daniel Ball,* 10 Wall. 557, or *The Ventura,* just decided, but for reasons already given they have no application. In the case of *The Ventura,* a steam-ship navigating the Pacific Ocean between San Francisco and the lower ports of California, carrying merchandise

between those ports designed for other countries, was held entitled to the benefit of the limited liability act. Neither do the facts that a court of admiralty would have jurisdiction over the vessel, nor that she is subject to the navigation and inspection laws of the United States, and bound to carry the ordinary lights of a steamer, have any material bearing upon this question.

There is also strong reason for holding that the Mamie falls within the exception of vessels "used in rivers." She was principally employed upon the Detroit river. I do not consider the fact of her annual trip to the Ohio islands in Lake Erie as material: it was wholly exceptional. She was not fitted for the lake trade, had not the requisite complement of men, and would be powerless against the storms which sweep over these waters. Whether her excursions to the St. Clair flats can be considered as taking her out of the catagory of river steamers, would depend upon the fact whether Lake St. Clair can be considered as one of the great lakes, within the case of *Moore* v. *The American Transp. Co.* 24 How. 1. My own impression is that it ought to be treated rather as an expansion of the river, whose source is Lake Huron, and whose mouth is at Lake Erie—an expansion practically of the same nature as Lake St. Peter in the St. Lawrence, and the Tappan Zee in the Hudson; but as this question is not unlikely to arise in the future, I express no decided opinion upon the point.

Upon the best consideration I have been able to give this case, I have come to the conclusion that the owners of the Mamie are not entitled to the benefit of the limited liability act, and the petition is therefore dismissed.

NOTE. See *In re Long Island N. S. P. & F. T. Co. ante*, 599.