### THE SAKITO MARU.

### HERMOSA AMUSEMENT CORPORATION, Ltd., v. THE SAKITO MARU et al.

### NIPPON YUSEN KABUSHIKI KAISYA v. HERMOSA AMUSEMENT CORPORATION, Ltd.

### No. 1138.

District Court, S. D. California, Central Division.

Oct. 31, 1941.

Cluff & Bullard, Alfred T. Cluff and Hugh B. Rotchford, all of Los Angeles, Cal., for Hermosa Amusement Corporation, Ltd., and another.

Phi. O. Clough, of Los Angeles, Cal., for International Broadcasting Corporation, and another.

Gladys Towles Root and H. C. Velpmen, both of Los Angeles, Cal., for Elwood Johnson and others.

Wayland & Stearns, Leo B. Wayland and Frank L. Stearns, all of Los Angeles, Cal., for Grace E. Mayo.

David I. Lippert, of Los Angeles, Cal., for Frank F. Mayo.

H. C. Eastham, of San Pedro, Cal., for Roger Culp.

McCutchen, Olney, Mannon & Greene and Harold A. Black, all of Los Angeles, Cal., for Helen McGrath.

Lillick, Geary, McHose & Adams by James L. Adams, L. Robert Wood, and Reid R. Briggs, all of Los Angeles, Cal., for Nippon Yusen Kabushiki Kaisya.

Claud B. Andrews, of Los Angeles, Cal., for George W. Berger.

Edward C. Purpus and Charles C. Montgomery, both of Los Angeles, Cal., for Norma Rubin and others.

Wright & Millikan and Charles E. Millikan, all of Los Angeles, Cal., for Wilma Greenwood.

Claude F. Weingand, of Los Angeles, Cal., for L. R. Ohiser.

Reay, Scharf & Reay, of Los Angeles, Cal., for J. Eldon Anderson.

Wilson & Thomas, of Los Angeles, Cal., for Lucy Sylvester.

Harvey R. McKee, of Los Angeles, Cal., for Wilfred Rasmussen.

HARRISON, District Judge.

This action is a consolidation of various libels and claims arising out of the collision on September 4, 1940, of the Motor Vessel "Sakito Maru", and the fishing vessel "Olympic II", wherein seven and possibly eight persons lost their lives. The present trial was restricted to the sole issue of liability. Naturally, each vessel accuses the other and excuses itself.

The Motor Vessel "Sakito Maru" is a modern merchant vessel engaged chiefly in the transportation of cargo and is powered by two Diesel engines. The dimensions of the "Sakito Maru" are as follows: Length overall 154½ meters or 506.76 feet; length between perpendiculars 145 meters or 465.60 feet; breadth 19 meters or 62.32 feet; gross tonnage 7,126.32 tons; net tonnage 3,900.-09 tons.

The distance between the bridge and the bow of the "Sakito Maru" is 65 meters or 213.20 feet. At the time of the collision, the draft of the vessel was 24 feet 7 inches forward and 27 feet 11 inches aft. Loaded as she was at that time, the bridge was about 52 or 53 feet above the waterline.

The vessel is equipped with a gyro compass, located in the wheelhouse and used for steering, and three magnetic compasses, the first also located in the wheelhouse, the second on the flying bridge over the wheelhouse, and the third on the poop deck. A gyro compass consists of a rapidly spinning rotor so swung as to maintain its axis in the geographical meridian in pointing to the true north. The gyro compass aboard the "Sakito Maru" has no correction and the course shown on it is a true course. The gyro compass is also equipped with a course recorder so that the course of the vessel is recorded on a graph which shows the heading of the vessel, in degrees of the compass, at any and all times. This recorder works automatically.

The "Olympic II" was built of iron in 1877 at Belfast, Ireland, and was originally rigged as a sailing ship known as the "Star of France". In 1933 her three masts were cut down or dismantled in part, and she was converted into the condition in which she was on the day of the collision and was thereafter referred to as a fishing barge. Her dimensions were as follows: Length 238 feet; breadth 38 feet, depth 22 feet; gross tonnage 1,766 tons; net tonnage 1,-514 tons. The "Olympic II" was not self-propelled. She had one iron bulkhead which extended athwartsships about 20 feet aft of the stem, which met the test for sailing vessels. (See Sec. 65, Rule III, Coastwise Rules). At the time of the collision there were stowed in her hold 1,500 tons of sand, gravel and cement blocks to minimize motion and to add to the comfort of her patrons, and her draft was about 17 feet forward and 17 feet 2 inches aft. She was

anchored or moored at that time fore and aft.

At the time of the collision which occurred at about 7:10½ o'clock A. M. on September 4, 1940, the "Olympic" was anchored on a fishing bank commonly known as "Horseshoe Kelp", about 3.3 nautical miles in a direction approximating 160 degrees true from the lighthouse, at the end of the west breakwater at the entrance of Los Angeles Harbor and in an area that occasionally is affected by fog.

"Horseshoe Kelp" is and has been for many years known as a fishing ground or bank that attracts a large number of both sport and commercial fishermen. At the height of the season fishing crafts of every description may be found and the number often runs in excess of 100.

For several years last past old vessels have been towed to this fishing ground and there anchored and used as floats from which people can fish. Persons desiring to fish are taxied on shore boats and pay a small fee for an opportunity to enjoy this form of recreation. These boats used as floats are commonly referred to as fishing barges.

On September 4, 1940, beside the "Olympic", two other vessels known as the "Point Loma" and the "Rainbow" were moored in the same general vicinity. The distance between the "Olympic" and the "Point Loma" was 400 yards; between the "Point Loma" and the "Rainbow" 1,600 yards; and between the "Olympic" and the "Rainbow" 1,800 yards. Cross bearings indicate the "Rainbow" was 144 degrees true, three miles from Los Angeles Lighthouse and the "Point Loma" bore 159 degrees true, three miles from Los Angeles Lighthouse.

The "Olympic", at the time of the collision, was anchored in the open sea and not in or in the vicinity of any channel or fairway. She was surrounded by miles of navigable waters. Ships leaving Los Angeles Harbor headed south passed in close proximity of the "Olympic". This was also true of ships entering the harbor from the south. Vessels leaving Los Angeles Harbor for southern ports customarily followed a course varying from 160 degrees true to 162 degrees true. While those approaching from the south usually followed a course of 340 degrees true.

The "Sakito Maru" at the time of the collision was on a voyage from New York to Yokahama, via the Panama Canal and Los Angeles Harbor. Until immediately prior to the collision and since noon, September 3, 1940, the "Sakito Maru" steered a course of 340 degrees true. The first officer went on watch at 3:55 o'clock A. M. and with him on watch were an apprentice officer and two quartermasters, one of whom acted as helmsman, while the other stood lookout, on the bridge. A lookout was also maintained at the bow until daylight. At 5:20 o'clock A. M. a one-point bearing was taken from the south end of Santa Catalina Island. This bearing was followed by three two-point bearings, taken from the southeast end of Santa Catalina Island and from Long Point on Santa Catalina Island. Another two-point bearing was taken at 5:58 o'clock A. M. and still another two-point bearing at 6:08 o'clock A. M. At 6:28 o'clock A. M. a one-point bearing was taken on the southeast end of Santa Catalina Island. These various bearings fixed the position of the vessel and the same was marked from time to time on the navigating chart.

If the "Sakito Maru" had followed her plotted course, she would not have passed over the fishing grounds and all would have been serene, but due to the influences of wind, current, tide or the usual inaccuracies in steering she varied sufficiently from the plotted course to bring her directly into "Horseshoe Kelp". It will, therefore, be observed that she had plotted her course so as to avoid said fishing grounds. Of course, there is no evidence indicating she was intentionally endeavoring to avoid said fishing grounds.

The master of the "Sakito Maru" was called to the bridge at 5:58 o'clock A. M., at which time he was told of the position of the vessel. He returned to his quarters, but, pursuant to further instructions, was called again to the bridge at 7 o'clock A. M. Up until that time the weather had been good with clear visibility. The engines of the vessel were set and had been set full ahead and she was proceeding at a speed of 16 knots. At about 7 o'clock A. M. it could be seen that it was misty some distance ahead, although visibility on the port and starboard sides of the ship remained good. Visibility ahead at that time was estimated by Captain Sato, before recess, at three miles, and after recess, at one mile. At 7:03 o'clock A. M. an order of slow ahead on the engines was given and promptly executed.

One of the controversial questions in this litigation is the extent of visibility at and

just prior to the collision. All witnesses admit that the morning was foggy but the extent of visibility varies from 200 meters to a mile and over. Fortunately, the court has had the benefit of the testimony of a number of disinterested witnesses. While these witnesses gave their estimates, they were not mere guesses because of the location of the "Point Loma" and "Rainbow", which gave them markings to tie into. They also were able to give estimates compared with the length of the "Sakito Maru". From such testimony, I am of the opinion, that the "Olympic" was clearly visible to a person standing in the bow of the "Sakito Maru" for at least 1,800 feet. One of the disinterested witnesses produced by the "Sakito Maru" was William H. Collins, Master of the salvage tug "Ray R. Clark", who holds both an operator's and pilot's license for San Pedro and Long Beach area. He has owned boats since 1906 and has spent most of his time on the waters of Los Angeles Harbor. He testified as follows:

"By the Court: How far was the "Point Loma" from the "Olympic"? A. Well, I would say around 1,200 feet—1,000 or 1200 feet, is what I would say.

"Q. How far was the "Sakito Maru" from the "Olympic" when you first saw it? A. Approximately the same distance; the other side of him maybe not quite as far. Distances on the water, as I have found after many years, are very, very deceiving. I have started out a thousand times to run a line over to something, and found out that I did not have enough.

"Q. In other words, you generally underestimate than over? A. Usually, because you will say, 'I have got 1200 feet of line, and that will reach over there', and you roll it out, and when you reach the end it still doesn't make it."

This testimony and other of like character has satisfied me that Captain Sato's estimate of 200 meters cannot be reconciled, even with his previous estimates and that of his first officer, who estimated the visibility at 7:09 o'clock A. M. to be about 600 meters. In fact, the court is given little help from those on board of the "Sakito Maru". Outside of the testimony of Captain Sato and the first officer, T. Yokota, no one gave even an estimate of visibility. The lookout, S. Shimada, who had three years' sea experience, did not know how far the "Olympic" was from the "Sakito Maru" when he first sighted her.

Other evidence that controverts the Captain and the first officer of the "Sakito Maru" is the fact that many witnesses, when they saw the "Sakito Maru", were not alarmed, because they felt she was going to miss the "Olympic" and had no realization of danger until the "Sakito Maru" was very close when she seemed to change her heading. For instance, take the testimony of Elwood Johnson, a fisherman on the "Olympic" and libelant on account of the death of his son as a result of the collision, who testified that when he first saw the "Sakito Maru" he had just cast his line out, not having any apprehension of danger, continued to let his line out until it was out approximately 200 yards. He continued fishing and watching the ship until the "Sakito Maru" appeared to turn toward the "Olympic", then thinking the "Sakito Maru" was going to cross his line, reeled it in and when he realized a collision was imminent, ran 12 feet and grabbed hold of the rail. Another example is found in the testimony of Leonard Smith, who had time to run his water taxi from alongside the "Point Loma" to within a point of the bow of the "Olympic", after the "Sakito Maru" came into sight. T. Yokota saw people fishing on the "Olympic" when he first saw her and the lookout testified to the same effect. This testimony corroborates the witnesses who had no realization of danger and further indicates the fog was not very thick. It further indicates that the "Olympic" should have been sighted long before the lookout could discern people on her deck fishing.

Almost without exception witnesses on the "Olympic" and nearby boats, when they first saw the "Sakito Maru", thought she was going to pass them by until all of a sudden she seemed to change her heading toward the "Olympic". The records of the "Sakito Maru" and Captain Sato's testimony establish the fact that when the lookout gave warning of the presence of the "Olympic", a full starboard order was given, and the "Sakito Maru" was actually responding to such order at the time of the impact. This fact convinces me that many witnesses saw the "Sakito Maru" long before her lookout discovered the presence of the "Olympic", and long before Captain Sato gave the full starboard order.

Evidence also further discloses that the fog was tending to lift at the time of the collision and the bright sun of early September was breaking through and dissipat-

ing the fog. The season of the year would negative a dense fog.

I consider the testimony received from the personnel of the "Sakito Maru" very unsatisfactory. The Captain testified that at 7 o'clock A. M. his estimate was three miles, which he later changed to one mile. The first officer testified visibility at 7 o'clock A. M. was three miles. At 7:09 o'clock A. M. the first officer testified visibility was 600 meters. Other members of the crew would not or could not give an estimate.

The first fault charged by the "Olympic" against the "Sakito Maru" is immoderate speed. In attempting to arrive at the speed of the "Sakito Maru", I have disregarded the testimony of all eye witnesses who attempted to judge the speed and have accepted the evidence furnished by the "Sakito Maru". The testimony of Captain Sato and the first officer, is that the "Sakito Maru" was proceeding at her normal cruising speed of 16 miles per hour up to 7 o'clock A. M. At 7:03 o'clock A. M. she encountered fog ahead and reduced her speed to 6½ miles per hour; that it required three minutes for her speed through the waters to decelerate to 6½ miles per hour. At 7:09 o'clock A. M. the lookout reported the presence of the "Olympic" ahead. That at that time the "Olympic" was 200 meters ahead. At 7:09 o'clock A. M. the engines were reversed and at 7:10½ o'clock A. M. came the collision.

The captain testified that at 7:09 o'clock A. M. visibility extended only 200 meters. It is admitted that when the engines are going slow ahead at 6½ miles per hour and are reversed full astern, the "Sakito Maru" requires 300 meters to come to a full stop. Thus we find a motor vessel proceeding in the fog, approaching an entrance to a harbor where she has every reason to expect the presence of other vessels, proceeding at a speed where she could not possibly bring herself to a stop in time to avoid a collision with either an approaching or anchored vessel. This is a fault chargeable against this motor vessel. Even if the visibility had been in accordance with Captain Sato's estimate of 300 meters, the vessel was going at an immoderate speed. The Belgian King, 9 Cir., 125 F. 869; The Ernest H. Meyer, 9 Cir., 84 F. 2d 496; Silver Line v. United States, 9 Cir., 94 F.2d 754.

Proctors for the "Sakito Maru" advance a theory that "when a navigator exercises reasonable care in determining what are the existing circumstances and conditions but despite the exercise of such reasonable care arrives at what proves later to be an erroneous conception of the same, he cannot be held liable for permitting his vessel to proceed at a speed which is moderate, when considered in the light of the existing circumstances and conditions as determined by him after the exercise of reasonable care, despite the fact that such speed might not be moderate when considered in the light of the existing circumstances and conditions in reality." In other words, it is their contention that the "Sakito Maru" cannot be held responsible for the error in judging the visibility at the time of the collision. They admit their theory is unique and without authority. It naturally falls under its own weight. The very reading of Article 16 of the International Rules, 33 U.S.C.A. § 92, clearly states that the vessel "shall go at a moderate speed, having careful regard to the existing circumstances and conditions."

The same type of argument was raised in Oceanic Steam Navigating Co. v. John W. Aitken, 196 U.S. 589, 25 S.Ct. 317, 318, 49 L.Ed. 610, and answered by Justice Holmes when he stated:

"* * * With reference to a part of the argument, we think it proper to say a word. It is quite true that negligence must be determined upon the facts as they appeared at the time, and not by a judgment from actual consequences which then were not to be apprehended by a prudent and competent man. This principle nowhere has been more fully recognized than by this court. Lawrence v. Minturn, 17 How. 100, 110, 15 L.Ed. 58, 62; The Star of Hope (The Star of Hope v. Annan), 9 Wall. 203, 19 L.Ed. 638. But it is a mistake to say, as the petitioner does, that if the man on the spot, even an expert, does what his judgment approves, he cannot be found negligent. The standard of conduct, whether left to the jury or laid down by the court, is an external standard, and takes no account of the personal equation of the man concerned. The notion that it 'should be coextensive with the judgment of each individual,' was exploded, if it needed exploding, by Chief Justice Tindal, in Vaughan v. Menlove, 3 Bing. N.C. 468, 475. And since then, at least, there should have been no doubt about the law. Com. v. Pierce, 138 Mass. 165, 176, 52 Am.Rep. 264; Pollock, Torts, 7th Ed. 432."

While Captain Sato estimates the speed of his vessel at 6¼ to 6½ miles per hour at 7:09 o'clock A. M., I am satisfied that he is in error in this respect, and that the vessel was proceeding at not less than 8 miles per hour. The records of his own vessel indicate a speed in excess of 6 miles per hour. According to the "Sakito Maru's" deck log and chart, she was 9,120 feet from the "Olympic's" position at 7:03 o'clock A. M. All of that distance, except the last 536 feet, she covered between 7:03 o'clock A. M. and 7:09 o'clock A. M. Thus it will be seen that she covered approximately 8,584 feet in six minutes or 14 miles per hour. With reasonable allowance for error, it will be observed that my estimated speed of 8 miles per hour is conservative. A check of her tackometer readings also tends to verify my conclusions in this respect.

■ The charge that then "Sakito Maru" was not giving the proper fog signals has not been sustained. The evidence is overwhelming to the effect that her fog signals were proper.

■ The "Sakito Maru" is charged with the fault of not having an effective lookout. The evidence as to whether or not a lookout was posted at her bow is very conflicting, but I am accepting the testimony of those on board of the "Sakito Maru", that a lookout was on duty. I appreciate the fact that many witnesses testified that they saw no lookout, but I am inclined to accept the positive in place of the negative testimony.

But in view of my findings heretofore expressed on the visibility, it is quite apparent, that the lookout was a lookout in name only. He was charged with the responsibility of seeing that which was within his vision. This he failed to do. If he had been an efficient lookout, the collision easily could have been avoided and this failure of the lookout must be charged as a gross fault against the "Sakito Maru". The Catalina, D.C., 18 F.Supp. 461, and cases therein cited.

■ The "Olympic" also complains of the post-collision conduct of the "Sakito Maru" in two respects:

First, the withdrawal of the bow from the wound of the "Olympic": The impact took place at 7:10½ o'clock A. M. and the engines of the "Sakito Maru" were stopped at 7:11 o'clock A. M. and were then put astern at 7:13 o'clock A. M.

and the "Olympic" sank at 7:14 o'clock A. M. The wound according to the markings on the bow of the "Sakito Maru" after the collision, showed she had penetrated the "Olympic" 20 feet and 3 inches on the portside and 23 feet on the starboardside and a cross-ship's line between these two lines was 12 feet. The "Olympic" contends that good seamanship should have caused the "Sakito Maru" to hold her position in the wound until those on board were removed and that if she had done so, the sinking of the "Olympic" would have been delayed. The evidence on this feature of the case is very conflicting. I am of the opinion that the "Sakito Maru" did not put her engines astern until after the vessels had separated of their own accord. It seems to me that theorizing on whether the "Olympic" could have been kept afloat with such a wound in her mid-ship is too highly speculative to be placed in the category of a fault.

■ Second, the failure of the "Sakito Maru" to render immediate aid: The facts disclose that the "Sakito Maru's" engines were put astern at 7:13 o'clock A. M. and backed at least 300 meters, dropped her anchor at 7:17 o'clock A. M. and stopped her engines at 7:19 o'clock A. M. and lowered a life boat at 7:20 o'clock A. M. Inasmuch as there were other boats present at the scene of the collision, no loss of life was occasioned by any such delay, consequently, her conduct in no manner contributed to the loss of life and under the circumstances cannot be deemed a fault.

■ The "Sakito Maru" in its cross-libel charges the "Olympic" with many faults. She charges the "Olympic" with the failure of having a competent and attentive lookout on board. It appears that Louis R. Ohiser, the lookout, has proven himself to be an unstable witness and I have for the purpose of this opinion disregarded his testimony except where it has been amply corroborated. The evidence clearly shows that he saw the "Sakito Maru" long before the lookout of the "Sakito Maru" saw the "Olympic", and to that extent was more attentive to his duties than the "Sakito Maru's" lookout. In fact, the two are about equal as witnesses. One cannot tell the same story twice, while the other does not know anything except he was acting as a lookout and saw the "Olympic". Be that as it may, as a lookout, there was nothing Ohiser could do. His vessel

was anchored. He could look and he could see, but there was nothing he could do to avoid the collision. The ability to avoid the collision rested entirely on the oncoming "Sakito Maru". The proctors for the "Sakito Maru" contend that he could have rung the bell louder, but there was no occasion to make a special effort in this regard until such time as it appeared that a collision was imminent. He had no reason to believe that the "Sakito Maru's" personnel could not see as well as he could; nor, that they had been unable to hear the various signals given by the "Olympic" and other vessels. The failure to have a lookout must have been a contributing cause of the collision before it can be classed as a fault. The Europe, 9 Cir., 190 F. 475; The Blue Jacket, 144 U.S. 371, 12 S.Ct. 711, 36 L.Ed. 469.

■ The "Olympic" is further charged with the failure to give the proper fog signals. The evidence is overwhelming to the effect that the proper signals were given. The only conflict raised in this regard, is the testimony of the personnel of the "Sakito Maru" that no signals were heard until just immediately prior to the impact, and here again I have accepted positive testimony as against the negative.

The "Sakito Maru" charges that the "anchoring and deliberately maintaining the "Olympic" in a known steamer lane was a gross fault directly causing and contributing to the collision and all consequent losses".

As heretofore pointed out the "Olympic" was not anchored in a channel or fairway but upon the open ocean, consequently, she was not anchored in violation of 33 U.S.C.A. § 409. This feature of the case resolves itself into the question whether or not a vessel at its own peril anchors on a fishing bank, when said fishing bank happens to be in close proximity to a course used by merchant vessels.. It makes no difference whether the "Olympic" was anchored three months or one hour. Was it a fault per se for the "Olympic" to be so anchored at 7:09 o'clock A. M. on September 4, 1940?

Proctors for the "Sakito Maru" cite The Admiral Schley, 1 Cir., 131 F. 433; The Persian, 2 Cir., 181 F. 439, and other cases, but they teach nothing more than that it is a fault to anchor in such a manner as to prevent or obstruct the passage· of other vessels in channels and fairways. It has been held that even in a navigable channel there is no prohibition against anchoring, where under the circumstances there is sufficient room for moving vessels obeying the law to pass in safety. The Europe, supra; The Oregon, 158 U.S. 186, 15 S.Ct. 804, 39 L.Ed. 943; The John G. McCullough, D.C., 232 F. 637.

Proctors for the "Olympic" contend that she was a fishing vessel and therefore a favored vessel, 33 U.S.C.A. §§ 111 and 211, but it is doubtful whether she can be classed as a fishing vessel within the purview of said sections.

The "Sakito Maru" claims that the "Olympic" was warned by Philip J. Moynahan, a warrant officer of the Coast Guard, of her dangerous position. He testified in his deposition as follows:

"Q. I wish you would state whether the position of the "Olympic II", as indicated on that chart, was in or out of any of the sea lanes? A. I would say just outside of the main sea lane of that course usually taken by ships leaving Los Angeles on a southerly course for the Canal Zone and other points South.

"Q. Would that be equally true if the vessels were bound in, from the opposite direction? A. Yes, it would simply mean that they were coming in on a reverse course.

"Q. Speaking from your twenty years experience at sea, and your knowledge of conditions in that harbor, and in and out of it, please state, in your opinion, if it was dangerously close or a safe distance away? A. Dangerously close."

Again, he also testified as follows:

."A. We made our boarding in a routine manner, inspecting all equipment etc. and in the course of our conversation with the person in charge, informed him that we thought they were anchored in a very dangerous place.

"Q. Was any reply made by the Master? A. He replied that he had, of course, nothing to do with that; that he was only acting for the owner. He gave us the name and address of the owner. I don't remember anything more."

There is no evidence that this information was brought home to the owners of the "Olympic". It will be further noted that he did not testify she was anchored on a sea lane, but dangerously close to one and that "he thought" or in other words he had an opinion on the subject.

■ Under Section 1, 33 U.S.C.A. the Secretary of War had sufficient authority

to prevent the anchoring of the "Olympic" at her place of anchorage. In view of the fact that the "Olympic" and other vessels had been accustomed to so anchor over a long period of time, it is reasonable to assume that if the Secretary of War considered the place of anchorage of the "Olympic" dangerous to navigation he would have acted. Certainly, there is no presumption that the Secretary of War failed to perform his duties in that respect. As a matter of fact, the presumption is to the contrary.

I hold that the "Olympic" was violating no law in anchoring at her place of anchorage on the morning of the collision and that the "Sakito Maru" had no superior right of passage. To hold otherwise would preclude sport fishermen from anchoring at any time on the open unobstructed ocean.

Even if her place of anchorage was dangerous, such fact would not permit the "Sakito Maru" from escaping the consequences of her own failure in avoiding the collision when she had the ability to do so, as hereinafter more fully discussed under the heading of unseaworthiness.

The further charge is made that the "Olympic" was incompletely and inadequately manned, because it failed to comply with the statutory requirements of certified personnel, particularly 46 U.S.C.A. § 672 (a), (b), (c). Without discussing the applicability of said sections to the "Olympic", suffice it to say, that the lack of such personnel, by no stretch of imagination contributed to the collision or the resultant damage and loss of life. If there had been more people on board the "Olympic", the loss of life would undoubtedly have been greater.

The "Sakito Maru" charges the "Olympic" was unseaworthy because she did not have a certificate of inspection required by statute and because she failed to pass inspection required by statute.

The evidence shows that in 1938 the "Olympic" had the necessary certificate of inspection. That at that time the local inspectors recalled said certificate claiming all anchored pleasure vessels had to comply with the Load Line Act. 46 U.S.C.A. § 85. When the inspectors had determined that this section had no application and the standards of safety as provided by the General Rules and Regulations for coastwise passenger vessels, they decided 46 U.S.C.A. § 395 applied. It is a matter of common

knowledge that there has been considerable confusion in the minds of the authorities concerning the authority of the local inspectors over such vessels as the "Olympic". The large number of similar vessels anchored off the coast of Southern California used as pleasure crafts for fishing and gambling is unique to this district, and the problem of inspection and ascertaining their seaworthiness for the protection of the public has been a responsibility that the departments of the government have been anxious and ready to assume, provided they had authority to do so. Finally in 1940, the Bureau of Navigation insisted these pleasure vessels were subject to inspection under the provisions of 46 U.S.C.A. §§ 395, 396, 397, and 398. Therefore, on June 3, 1940, the U.S. Local Inspectors directed a circular letter to the "Olympic" enclosing certain minimum requirements as follows:

"Non-self propelled vessels over 100 gross tons, anchored or moored on the seas or on waters connected therewith, that are not protected from the hazards of the sea, which are patronized by the public for pleasure purposes, are subject to and shall be inspected and certificated pursuant to the provisions of the act of Congress approved May 28, 1908. (46 U.S.C. 395, 396, 397, 398 [46 U.S.C.A. §§ 395–398]) "The following general provisions constituting minimum requirements shall be followed in the inspection and certification of such vessels:"

Then follows some 41 minimum requirements. However, these requirements had not been enforced and owners of these pleasure vessels were given a reasonable length of time to comply with the same. Requirement No. 4 reads as follows: "A sufficient number of transverse watertight bulkheads shall be fitted so that the vessel will remain afloat with positive stability in the event any one main compartment is flooded."

Said Section 395 provides as follows: "The local inspectors of steamboats shall at least once in every year inspect the hull and equipment of every seagoing barge of one hundred gross tons or over, and shall satisfy themselves that such barge is of a structure suitable for the service in which she is to be employed, has suitable accommodations for the crew, and is in a condition to warrant the belief that she may be used in navigation with safety to life. They shall then issue a certificate of inspection in the manner and for the

purposes prescribed in sections 399 and 400. (May 28, 1908, c. 212, § 10, 35 Stat. 428.)"

It will be noted from that section that no rule making power is vested in the local inspectors. It will be further noted that Section 395 is a part of Chapter XIV, which provides for the inspection of steam vessels and that 46 U.S.C.A. § 375, provides for and invests in the Supervising Inspectors power to promulgate certain rules and regulations but nowhere do I find any such power vested in local inspectors. Even if they had such powers under Section 395, the same would of necessity have to apply to all seagoing barges. Heretofore, bulkhead requirements have been covered by Congress, 46 U.S. C.A. §§ 482 and 483, and by the Supervising Inspectors, § 72, Rule III and Section 65 of Rule IV, as well as others, General Rules and Regulations prescribed by the Board of Supervising Inspectors. The Bee, 2 Cir., 138 F. 303; Towboat No. 1, Norfolk & Western, 1 Cir., 74 F. 906; The H. M. Whitney, 2 Cir., 86 F. 697. I therefore held that the so-called minimum requirements of the local inspectors were a nullity and the failure to comply with the same does not establish the unseaworthiness of the "Olympic".

I further hold that the "Olympic" was not a seagoing barge within the contemplation of Section 395, 46 U.S.C.A. Congress has not defined the term "barge", except when used in connection with Sections 643(a), 660b and 672b, 46 U.S.C.A. § 672c. Generally speaking, "barge" is "a word of somewhat comprehensive signification" (9 C.J.S., Barge, p. 1542) and may cover crafts of many kinds. It may cover " 'pleasure boats, or boats of state, furnished with elegant apartments, canopies, and cushions, equipped with a band of rowers, and decked with flags and streamers, used by officers or magistrates;' and * * * 'a flat-bottomed vessel of burden for the loading and unloading of ships.' " the Mamie, D.C., 5 F. 813, 819.

The Encyclopedia Britannica defines "barge" as follows:

"The name barge was originally applied to a small sailing vessel but afterwards came into general use for a flat bottomed boat used for carrying goods on inland waterways. * * * Barges are usually towed or fitted with some kind of engine. The state barge was a heavy ornamented vessel used for carrying passengers on oc-

casion of state ceremonials. College barges are houseboats moored in the river for the use of members of college rowing clubs.

\*    \*    \*    \*    \*    \*

"The common principle of all types of barges and lighters is to have as large a hatchway as possible and as small a deck area as possible to save what is called "cupboard space" under deck in the hold and to make for easy and quick handling and therefore cheapness in loading and discharging cargoes."

The Oxford English Dictionary defines it as follows: "A small seagoing vessel with sails; a flat bottomed freight boat chiefly for canal and river navigation, either with or without sails. In the latter case also called a lighter. In the former, as in the Thames barges, generally dandy rigged having one important mast. * * * A rowing boat especially a ferry boat. * * * The second boat of a man of war; a long narrow boat generally with not less than ten oars for the use of the chief officers. * * * A large vessel propelled by oars or towed, generally much ornamented and used on state occasions. * * * An ornamental, houseboat. * * * A double decked passenger and freight vessel without sails or power and towed by steamboat." (Webster's International Dictionary definition also given).

In the limitation proceedings proctors for the "Sakito Maru", contended that the "Olympic" was not a "barge", a general name given to a large pulling boat. It is often given to flat bottomed craft, but more particularly to vessels built for towage purposes and cite as their authority Bradford's Glossary of Sea Terms.

It is therefore apparent it is necessary to ascertain the sense Congress used the word "barge" in said section 395, just as Judge Brown did in The Mamie, supra. Naturally, the word "barge" should be interpreted and applied within the manifest intent of Congress. 25 R.C.L. 988; 59 C.J. 1016, 1021.

The Congressional Record and particularly Senate Committee Report No. 560 clearly indicates the hazards that Congress desired to remedy and from said report it is clear that Congress intended to provide for the inspection of a type of vessel of ship shaped for the carrying of cargo under deck and used exclusively for

the carrying of freight, equipped with large hatches. Such barges had no power of self-propulsion and were usually towed from port to port.

This report throws an interesting light on the attempt of the local inspectors to promulgate rules. In said report among other things it is stated: "The first section of the bill provides for an inspection of the hulls of such barges similar to the inspection to which the hulls of seagoing freight steamers are subject, under Sections 4421 and 4423, Revised Statutes [46 U.S.C.A. §§ 399, 400]. The second section requires a simple but indispensable life saving equipment. In many instances, doubtless, this equipment is now provided. It should be required in all instances."

Clearly indicating that the inspection was to be limited to the hulls.

In endeavoring to follow out the intent of Congress, I hold that the "Olympic" was not a barge within the purview of said Section 395.

The failure to provide for the inspection of pleasure vessels such as the "Olympic" is a problem for Congress and the Supervising Inspectors and it is not the function of the courts to distort existing legislation as a substitute for such omission. This court is faced with the same problem in this regard that faced the court in The Bee, supra.

Even if the failure to have bulkheads as ordered by the local inspectors might be deemed a fault, I am of the opinion that the "Sakito Maru" is solely chargeable with the loss of life, personal injuries and property damages suffered by reason of said collision. The "Sakito Maru" by the exercise of reasonable care and prudence could have avoided the collision and I do not believe it lies within her mouth to shift any part of the damages to the "Olympic" by claiming she should have been equipped with more bulkheads. The immoderate speed coupled with her failure to have a competent and efficient lookout was the sole proximate cause of said collision.

I appreciate the fact that the "last clear chance" rule is not generally considered applicable in this country in admiralty (The Norman B. Ream, 7 Cir., 252 F. 409), at the same time our courts have not been backward in applying the rule under whatever name it may be labeled. The Yucatan, 9 Cir., 226 F. 437; Crowley Launch & Tugboat Co. v. Wilmington Transportation Co., 9 Cir., 117 F. 2d 651; American-Hawaiian S. S. Co. v. King Coal Co., 9 Cir., 11 F.2d 41; The William A. Paine, 6 Cir., 39 F.2d 586; The Europe, 9 Cir., 190 F. 475. However, Judge Augustus N. Hand, in the recent case of the Cornelius Vanderbilt, 2 Cir., 120 F.2d 766, 768, apparently recognized the rule under its true color when he stated:

"The Hempstead was aware of the approach of the Watuppa and her barge in time to avoid the collision and, if she was not, should have seen them but for her neglect to maintain a proper lookout. She had the Watuppa on her starboard hand and, as her master conceded, was bound to give the matter the right of way. The Watuppa, however, having a tow on a long hawser, difficult to manage in dangerous waters, could not readily swing her barge to the starboard of its position in the channel. Though each vessel neglected to blow passing signals, as required by the rules, and the Watuppa was on the wrong side of the channel, the outstanding fact is that the Hempstead had the last clear chance to prevent a collision by the exercise of ordinary care at a time when the Watuppa had the right of way and was not in a position to swing her tow away from the Hempstead's barges in time to avert disaster. Instead of holding back, the Hempstead took the risk of coming on and then attempting to swing her tow to port—a difficult manoeuvre in a narrow dangerous channel which failed of success."

Proctors for the "Sakito Maru" in summing up their case ask me to apply the rule set forth in The Samuel Dillaway, 1 Cir., 98 F. 138, 142, in judging the conduct and demeanor of the various witnesses. I heretofore expressed myself relative to the testimony of Ohiser. I recognize Captain Sate as an experienced master of exceptional ability and as a very impressive and convincing witness, but in view of my inability to reconcile the strong and convincing testimony of disinterested witnesses with that of Captain Sato, I am impelled to apply the rule in The Samuel Dillaway, supra, wherein the court said:

"This practical rule is only an application of the facts that the best disposed persons are prone to imagine theories to excuse the results of their own oversights, and that on the high seas the rapid oc-

currence of events, in connection with the approach of two colliding vessels at night, naturally leaves confusion in the minds of those who fail to maintain proper vigilance and a state of preparation, and who are, therefore, surprised by unexpected, sudden catastrophes."

I am therefore convinced tha. Captain Sato in loyalty to his own ship and crew has placed too much credence in the testimony of his own lookout and has thereby unconsciously submerged his own opinion and permitted the testimony of the lookout to become his own present conclusion.

The property damage claims of the Hermosa Amusement Corporation, Ltd., George W. Berger and Norma Rubin as set forth in the first count in her libel in intervention will be referred to David B. Head, Esq., U. S. Commissioner, as Special Master. The balance of the claims will be heard in this court.

Upon the ascertainment of the award to the respective parties entitled thereto, the court will enter its decree in accordance with this opinion.