# CHARLESTON.

JESS KELLER, INFANT, *etc. v.* NORFOLK & WESTERN RAILWAY COMPANY, *et als.*

(No. 6704)

*And*

LENA KELLER, *Admrx., etc. v.* NORFOLK & WESTERN RAILWAY COMPANY *et als.*

(No. 6720)

Submitted October 15, 1930. Decided October 21, 1930.

(Rehearing Denied December 2, 1930)

*J. Powell Royall* and *Strother, Sale, Curd & St. Clair,* for defendant in error.

*F. M. Rivinus, Crockett & Tucker* and *Goodykoontz & Slaven,* for plaintiff in error.

HATCHER, JUDGE:

Damages for alleged wrongful death of H. C. Keller and for physical injuries to Jess Keller, respectively, are sought in these cases. A verdict for the administratrix of H. C. Keller was set aside, and one for Jess was sustained by the trial court. These actions arise from the same accident, have substantially the same evidence, and will accordingly be dealt with in one opinion.

About eight o'clock on the morning of April 16, 1929, H. C. Keller and his three sons, Clay, Charles and Jess, aged eighteen, thirteen and ten years, respectively, started across a private railroad crossing in a Ford roadster. The car was struck from the right by a regular passenger train of defendant (running on time) causing the death of Keller and injuries to Jess. Clay was on the left of the seat, driving the car; the father was on the right, and the little boys were between them. Clay testified that he looked for and saw no train before going on the crossing; that in watching for a train he allowed the car to get a little off the crossing; that the rear wheels were checked by the second rail, stalling the engine and leaving the rear part of the car (only) on the track; that he then looked again and saw no train, but did not look any more; that while trying to start his engine, the car was struck by the train without any warning of its approach until within a few feet; that the car stalled about one and one-half minutes before the collision;

and that he did not know whether his father looked for the train or not. The testimony of Charles and Jess is substantially the same as that of Clay. A number of witnesses for plaintiff say they heard no train signals closer than a mile or so to the crossing until they heard distress signals just before the collision. Evidence for plaintiffs fix the distance at which the crossing could be seen from the track at from about nine hundred to sixteen hundred feet.

The version of the trainmen is that the fireman and engineer could see the crossing at distances of about 900 and 500 feet respectively; that the whistle was blown as a crossing warning in the bend about one-half mile from the crossing; that at a distance of some eight or nine hundred feet the fireman noticed the car approaching the crossing and commenced ringing the bell; that when he saw the car was not stopping, he blew the whistle; that the engineer was watching the track and did not see the car until it was right at the crossing; that he immediately threw on the emergency brake and applied the sand, which was all he could do as the train was "drifting" at the time; and that the car was entirely upon the crossing when it was struck. C. J. Jeter, a witness for the plaintiffs, supports the engineer as to the whistle being blown in the bend above the crossing. The testimony of the trainmen as to the position of the roadster at the moment of collision is confirmed by the following undisputed and unquestioned evidence. (a) The ground was scraped for a distance on the outer side of each rail. (b) There is an indentation about six inches deep in the right door (sheet steel) of the car, which was received in the collision and which corresponds exactly to the dimensions of the knuckle of a steel coupling on the pilot beam of the engine. (The beam extends across the front of the engine about thirty inches above the rail, and the coupling is in the exact center of the beam.) (c) Two iron steps, one on each side of the pilot beam, were "bent in."

Had the car been at the place located by plaintiffs when it was struck, the ground would have been scraped on both sides of the second rail only; the indentation of the coupling knuckle would have appeared somewhere on the rear of the car, if at all, and only one step would have been bent in. The proven

physical facts demonstrate that plaintiffs' witnesses are confused as to the position of the car at the moment of collision; and that instead of merely the rear of the car being on the track, the entire car was on it, the center of the car being about the center of the track. The plaintiffs have no explanation whatever of why the car was squarely on the track when it was struck. Testimony for defendant, which is also undisputed, shows that when sufficient power had been exerted to propel a car like the roadster up on the crossing, the acquired momentum of the car alone would roll it across and free of the track. So the theory that the roadster had been stalled at the actual place of collision is hardly tenable. It is incumbent on the plaintiffs to show just how and why the entire car happened to be on the crossing when struck. Until they show that, we have no way of determining just what prior duty the trainmen owed them, or whether that duty was breached. Verdicts based on oral evidence, controverted by established physical facts, as in these cases, cannot stand. *Owen* v. *Appalachian Power Co.*, 78 W. Va. 596, 609, 610; *Waller* v. *Ry. Co.*, 108 W. Va. 576; 46 C. J., p. 183, sec. 138.

This holding would ordinarily make further discussion of these cases unnecessary. As retrials are possible, however, it may not be inapt to make some abstract observations on the theory of recovery presented by plaintiffs' instructions. This theory ignored entirely the concurring negligence, if any, of the plaintiffs. Yet concurring negligence of a plaintiff may prevent the application of the doctrine of the last clear chance. *Waller* v. *Ry. Co., supra,* 585; Thompson on Negligence, sec. 240; 45 C. J. p. 993, sec. 545; *Drown* v. *Tr. Co.*, 76 O. S. 234; *Rider* v. *Ry. Co.*, 171 N. Y. 139, 154-5; *Norton* v. *Rr.*, 24 Pa. 465; *McDonald* v. *Ry. Co.*, 99 Tex. 207, 213; *Ry. Co.* v. *Wendt*, (Ohio) 165 N. E. 737, 739; *Thompson* v. *Morgan*, (La.) 119 So. 69. A number of cases are cited by plaintiffs supporting their theory, and an equal array is presented by defendant opposing it. The history of how this conflict originated may be of interest. In *Butterfield* v. *Forrester*, 11 East. 60, an English case decided in 1809, it appeared that the defendant, while repairing his house, had partially obstructed the street and that the plaintiff was injured thereby while riding along the

street without any caution and "as fast as his horse could go."
As the decision in this case, written by Lord Ellenborough, is
a model in judicial brevity as well as a leading case on the
law of contributory negligence, it is copied in full. "A party
is not to cast himself upon an obstruction which has been made
by the fault of another, and avail himself of it, if he do not
himself use common and ordinary caution to be in the right.
In cases of persons riding upon what is considered to be the
wrong side of the road, that would not authorize another pur-
posely to ride up against them. One person being in fault
will not dispense with another's using ordinary care for him-
self. Two things must concur to support this action, an ob-
struction in the road by the fault of the defendant, and no
want of ordinary care to avoid it on the part of the plaintiff."
Parke, B., in *Bridge* v. *Ry. Co.*, 3 M. & W. 245, another English
case, decided in 1838, formulated a general rule which he
says was "laid down with perfect correctness in the case of
*Butterfield* v. *Forrester*, and that rule is, that, although there
may have been negligence on the part of the plaintiff, yet,
unless he might, by the exercise of ordinary care, have avoided
the consequences of the defendant's negligence, he is entitled
to recover; if, by ordinary care, he might have avoided them,
he is the author of his own wrong." It would seem obvious
that *Butterfield* v. *Forrester* affords no support to Parke's gen-
eralization. Nevertheless he reiterated it in the more cele-
brated case of *Davies* v. *Mann*, 10 M. & W. 546, decided in 1842,
to which the confusion in the modern theories of contributory
negligence is largely attributed. In that case the owner of a
hobbled ass, improperly turned out on the highway, was per-
mitted to recover of one whose wagon, proceeding down grade
at "a smartish pace" and not under the immediate control of
the driver (who was walking behind the wagon) ran over and
killed the ass. That decision ignores entirely the concurrence
of the plaintiff's act in producing the injury as well as the
question of whether the defendant's teamster realized the
danger to the ass. Judge Thompson considers the rule of that
decision as "an almost total repudiation of the law of con-
tributory negligence," which has resulted he says "in the jury
ignoring the plaintiff's negligence entirely." Thompson,

*supra,* sec. 233. Beach criticizes it as a "pernicious and mischief making authority," and recommends that it be "distinctly repudiated." Beach on Contributory. Negligence, sec. 11.

No useful purpose would serve to trace the different "vagaries," and "flounderings" (Beach) which have been judicially formulated in attempting to rationalize the rule of *Davies* v. *Mann.* One interested may get a fair idea thereof from Beach, *supra,* chapters 1 to 5, inclusive. Our own court has not escaped the heresy of that decision; so our first duty should be to remove the beam from our own eye. A leading case in this jurisdiction, and one relied upon by the plaintiffs is *Riedel* v. *Traction Co.,* 69 W. Va. 18. In that case Mrs. Riedel gave one ineffectual glance in the direction of the defendant's approaching traction car, and then turning her back, walked in the same direction the car was moving diagonally across the street to the crossing, where the car overtook her. It was shown that she was almost directly in line of the motorman's vision for some distance as she proceeded towards the crossing, and that he gave no alarm and made no effort to have his car under control prior to the collision. The defendant offered no testimony. A judgment for the plaintiff was sustained. Instead of analyzing the case in a rational manner, the court employed a labored process of reasoning, which it attributed to *Davies* v. *Mann.* By that process the negligence of plaintiff was treated as prior in point of time to and virtually as having ended before that of the motorman began; and that of the latter as subsequent to that of plaintiff, and as such the immediate cause of the injury. Actually the negligence of the plaintiff continued uninterruptedly every second from the time she started to the crossing until the collision, and was concurrent in every way with that of the motorman, if the evidence establishes his negligence. The court's treatment of the case was therefore speculative and inconsistent with the facts.

In acknowledging allegiance to *Davies* v. *Mann,* the opinion mistakenly lauds that case as being almost universally followed, citing Sherman & Redfield on Negligence, sec. 99. The reference is not a happy one, as that authority in that very

section says that the language of Parke, B., is "perhaps too broad and which has not been here adopted." And again "It is possible too, that the application of the principle of *Davies* v. *Mann* was erroneous."

The doctrine of the last clear chance is a simple and meritorious one, and bears its definition in its title. Its simple test is whether the defendant had the opportunity to prevent the accident after the plaintiff ceased to have it. *Darling* v. *Ry. Co.*, 197 Cal. 702. Its application needs no perversion of logic or distortion of facts. Yet the casuistry of the *Riedel* opinion was followed in *Schoonover* v. *Rr. Co.*, 69 W. Va. 561, and in a number of other subsequent decisions. However a return to rational treatment, in cases involving this doctrine, was made in *McLeod* v. *Laundry Co.*, 106 W. Va. 361, and *Waller* v. *N. & W. Ry Co.*, *supra*.

Speaking only for myself at this time, it seems that there is one graft still remaining in our pronouncements of that doctrine which should be pruned, and that is the one holding that the defendant has the last clear chance, though in fact ignorant of the plaintiff's danger, when by the exercise of reasonable care he could have discovered it. The logic of the doctrine of the last clear chance calls for actual knowledge so that impending injury may be averted. Imputed knowledge affords no such *clear chance*. Why indeed should knowledge be imputed to the defendant without also imputing it to the plaintiff? Why mete out a measure to one litigant different from that to the other? Why should justice thus discriminate? Is the duty of one to preserve himself from injury less than the duty of another to so preserve him? *Waller* v. *Ry. Co.*, *supra*, answers no. It is true that trainmen, motormen, automobile drivers, and others owe to the public the exercise of due care. It may be that failure to exercise that care under some circumstances will amount to the grossest negligence, and will sustain a recovery, despite some contributory negligence. But that is another question and should be allocated to its proper place in the law of negligence. It has no place in a doctrine which is founded on actual knowledge. See cases cited under 45 C. J., p. 990, note 16, and *Nicolai* v. *Ry. Co.*, (Cal.) 267 p. 758.

The judgment of the circuit court is affirmed in the case in which Lena Keller, administratrix, is plaintiff; but is reversed in the case in which Jess Keller is plaintiff.

*Affirmed in part; reversed in part.*