**THE MARY H.**

**THE PATIENCE.**

**THE PROSPECT II.**

**THE FRANCIS L. CROWE.**

Nos. 17019, 16990.

District Court, E. D. New York.

March 14, 1946.

Mahar & Mason, of New York City (Frank C. Mason, of New York City, of counsel), for Sargent Barge Line.

Hagen & Eidenbach, of New York City (Nelson J. Johnson, of New York City, of counsel), for Frank Segrave.

Purdy & Lamb, of New York City (Edmund Lamb, of New York City, of counsel), for the Prospect II.

Macklin, Brown, Lenahan & Speer, of New York City (Leo Hanan, of New York City, of counsel), for the Patience.

KENNEDY, District Judge.

These are two cases arising out of a collision which occurred at the mouth of the Harlem River at 9:20 a. m., on December 12, 1943. Two libels in rem were filed: one by the owner of the barge Mary H. and the other by the owner of the barge Frances L. Crowe. The claim of fault is against the tugs Patience and Prospect II.

Patience is at least 70 feet long. On the morning of December 12, 1943, she was bound north in the East River; her destination was the rack at 96th Street. She had in tow four barges. Mary H. was in the head tier on the port side, and the Frances L. Crowe was in the head tier on the starboard side; astern were two other barges. The head boats of the tier were made fast to Patience with steel hawsers, the scope of which was about fifteen fathoms. The overall length of the tow was, therefore, at least 350 feet, each barge being about 100 feet long.

The tide was flood; there was a twenty-five mile breeze from the southwest. The force of the tide under foot was about four knots in the East River and slightly less in the Harlem River.

As Patience and her tow rounded Horn's Hook, the tug slowed down. Her intention was to proceed to a point near the sanitation dock on the Manhattan side, then to proceed northerly, and ultimately to round to against the rack.

At this time Prospect II was engaged in warping a large steel barge (the Cape Jeff) loaded with coal away from the northerly end of the rack. Cape Jeff is 133.9 feet long. Her beam is 34 feet and her depth 15.5 feet. She was fully loaded and was lying on the inshore side of two other barges with her stern upstream. Prospect II was engaged in a maneuver calculated to get Cape Jeff away from the rack and then to tow her through Hell Gate to the northward of Mill Rock and then up to Port Morris.

Each tug captain understood the intention of the other. But Cape Jeff was obviously difficult to manage. Prospect II, after securing the off-shore barges, put a headline on the starboard stem corner of Cape Jeff and backed out into the stream. When the barge was clear of the rack, Prospect II then shifted the backing line to the port stern corner and continued to back in order to straighten the barge out parallel to the rack. The intention then was, after casting off the backing line, to go ahead so that the starboard side of Prospect II would be along the port side of Cape Jeff, secured by a headline, strap, and sternline. The strap was first secured, running from Cape Jeff's port quarter cleat to a bitt forward on the starboard side of Prospect II. The headline ran from the stem of Prospect II to a cleat on the port forward quarter of the barge. The sternline was never secured, at least until after the collision occurred. The fact is that the deck hands on Prospect II were attempting to put this sternline out just before and at the time of the collision. They made an attempt to do this at least three times during this period by trying to throw the line across an ever widening space between the tug and the barge.

One very important element in the determination here of fault is the place of collision. It will be necessary for me to summarize the conflicting versions which the record discloses. But before doing that I should mention the fact that the barges of Mary H. and Frances L. Crowe were obviously completely ignorant as to how the collision occurred. I say this now because their testimony appears at the beginning of the record, and, largely for the reason that they simply knew nothing about the collision, there was a considerable amount of confusion, reflected in the record, confusion produced in part by their testimony. I should say also that the trial record is nothing to be proud of for another reason: the masters of the tugs often became voluble and excited, and supplemented their testimony with gestures which make the printed answers meaningless. But this can not be helped. And actually the claim of fault asserted by the respective tugs is perfectly clear.

Patience says that after she rounded Horn's Hook on left rudder she intended to go across the river to Mill Rock; and she says she actually did this. Her claim is that Prospect II in the meantime was making headway in a southerly direction from her original position at the rack. Patience says the collision occurred at a point 125 yards almost due north of the light on the southerly end of Mill Rock.[1] This point is not more than 300 feet to the westward of Mill Rock.

Patience says that just before she arrived at what she claims was the place of collision, and having had Prospect II under observation at all times after she rounded Horn's Hook, she formed the intention of making her round to on left rudder. Patience claims that since she had a privilege against Prospect II she blew two blasts to indicate that she would leave Prospect II on her starboard hand. But the record makes it obvious that at this instant Patience knew that Prospect II was not under control. There are points where the master of Patience seems to have denied it, but it is perfectly clear that he knew Prospect II had no sternline out to her tow. Therefore, he knew that Prospect II could not successfully back out of the path which Patience was to follow, and even on his own version of the place where the collision occurred the master of Patience, when he signaled for a starboard hand passage, was forcing Prospect II into an impossible maneuver.

Patience says that when she blew two

---

[1] This place is marked "c" (in pencil) on Prospect II's exhibit 2 which is a chart.

blasts and put her helm over, she immediately stopped, realizing that collision was imminent. According to her version, her barges, which were still on a northerly heading, continued in that direction. The starboard hawser grew taut and the port hawser slacked. This, says Patience, not only swung the forward starboard corner of the barge Frances L. Crowe into the bow of Cape Jeff; it also caused Patience to trip around and damage the port side of Mary H.

I do not believe that on her own story Patience is in any position to deny fault. It is perfectly obvious that her master knew that Prospect II had no sternline out,[2] and that Prospect II had no real option except to back, which under the circumstances would swing her around right into his own path,[3] and that he had become irritated at what he thought was unreasonable delay on the part of Prospect II in making up her tow.[4] Upon his own version of the facts, the master of Patience could have continued his northerly course, leaving Prospect II on his port hand, without making any sacrifice of any kind. He had plenty of water to the northward of Mill Rock and the maneuver which he himself claims he attempted to carry out was nothing short of reckless.

So much for the fault of Patience. Whether or not Prospect II ought to be held depends almost entirely on where the collision occurred. I have said that Patience places it at a point 125 yards almost due north of the light on the southern end of Mill Rock, and 300 feet off that island. If the collision did happen there, Prospect II ought certainly to be called upon to explain how she got there. She was making up her tow on the Manhattan side of the river at the northerly end of the rack. Her purpose was to shape a course to the northward of Mill Rock. If she did in fact drift down the river in a southerly direction across the channel, a distance of at least 350 yards to the point of collision, her conduct is certainly questionable.

But I do not believe this happened, and I am satisfied that the version of the place of collision and the maneuvers which preceded it, as given by Prospect II, are correct. She says that from the time she first put a line on Cape Jeff at the rack, and while she was attempting to make her lines fast, she never got more than 300 feet out into the stream. She denies that she made any headway in a southerly direction at all. She places the point of collision with the light on the southerly end of Mill Rock bearing south by east and distant 500 yards.[5] This point is at least 425 yards to the northwest of the place where Patience says the collision happened. And this discrepancy becomes even more startling when one looks at the chart and sees that at its widest point the channel at the mouth of the Harlem River is not much wider than 425 yards.

The reason why I think that the collision happened on the Manhattan side and quite near the rack ought to be obvious. Both tugs are clear on the point that just before the collision Prospect II was making up her tow. If that is so, she could not have drifted in a southerly direction in the teeth of the tide and a strong southwest wind. Moreover, having in mind that her intention was to direct her course to Port Morris, it is impossible to understand why she should want to make any headway in a southerly direction at all.

The version of the collision given by Prospect II is very simple. Her master says that he saw the Patience approaching, that he heard no two blast signal, but that when Patience neared the spot where Prospect II was making up her tow, she rounded to on left rudder, whereupon, Frances L. Crowe, undoubtedly aided by the wind and tide, swung into the bow of Cape Jeff. Under this version of the collision, and I accept it, there is no fault on the part of Prospect II, unless because of the clumsy and belated attempts of her deck hands to get out the sternline she blocked the river traffic. But the point where the master of Patience says he was when he first sighted Prospect II making up her tow at the north-

---

[2] See, for example, s.m. 123.
[3] S.m. 131.
[4] S.m. 128.

[5] This place is marked "P3" (in green crayon) on the chart, Prospect II's exhibit 2.

erly end of the rack is but 575 yards from there. Assuming that Patience was making only three knots over the ground, she was traveling 100 feet over the ground each minute. Therefore, there could have been no unreasonable delay on the part of Prospect II, for manifestly Patience was making good more than three knots over the ground, considering the state of the wind and tide, and even granting that she was proceeding under one bell.

As I see it, the claim of fault against Prospect II has no merit whatever unless complete credence is given to the story told by Patience. The latter submits a brief which assumes throughout (1) that the starboard hand rule applied; (2) that Prospect II, even though she was not made fast to her barge, made rapid headway in a southerly direction against the wind and tide; and (3) that the version of the collision given by Prospect II charges Patience with such crazy navigation that the story furnished by Prospect II is wholly incredible.

It is clear to me that the rule of special circumstances, and not the starboard hand rule, applied to the situation. Patience was able to maneuver; Prospect II was not. This makes cases like The Cornelius Vanderbilt, 2 Cir., 1941, 120 F.2d 766, and The George H. Jones, 2 Cir., 1928, 27 F.2d 665, certiorari denied Societe, etc., v. James Mc-Williams Blue Line, Inc., 278 U.S. 649, 49 S.Ct. 83, 73 L.Ed. 561, wholly inapplicable. While it is true that Patience was proceeding up the river with a fair tide, her master was perfectly well aware of the situation in which the Prospect II found herself. Therefore, this case is nothing like either The Galatea, 1876, 92 U.S. 439, 23 L.Ed. 727, or The Cockatoo, 2 Cir., 1932, 54 F.2d 1070. It is true that in both of the cases last mentioned vessels were held at fault for not giving way when they were stemming the tide, and therefore more easily maneuverable than the ships with which they were in collision. But here Prospect II was obviously not on any course at all, and the master of Patience could not possibly have thought that Prospect II was more easily maneuverable than Patience. Under the rule of special circumstances it was his duty to keep clear.

I have said that I do not believe Prospect II made any substantial headway in a southerly direction as Patience claims, because her own situation and the state of the wind and tide made this impossible. If this view be accepted the master of Patience certainly invited collision when he chose to proceed so far up the river before heading over for the rack. Patience says this makes the story told by Prospect II inherently incredible, citing The Bellhaven, 2 Cir., 1934, 72 F.2d 206, and The State of Virginia, D.C.Md., 1937 A.M.C. 1553. I think the doctrine of those cases is more readily applicable to the story told by Patience than it is to the version given by Prospect II. It is evident to me, as I have said, that the master of Patience, with plenty of water available to him, elected to make his turn where he did at the risk of miscalculation of the wind and tide. Nor is there any similarity between this case on the one hand and Petterson Lighterage & Towing Corp. v. New York Central R. Co., 2 Cir., 1942, 126 F.2d 992, on the other. I do not find that Prospect II was taking up the whole river, as the tug was in the Petterson case; this is a charge that could here more easily be made against Patience.

In each case libelant is entitled to a decree holding the Patience solely at fault.

This action having come for trial in its regular order on the pleadings and proofs of the respective parties, and due deliberation having been had thereon, the Court makes the following:

### Findings of Fact

1. On December 12, 1943, just prior to 9:20 a. m., the steam tug Patience was proceeding up the East River in a northerly direction at the mouth of the Harlem River. Patience is 70 feet long. She had four barges in tow on steel hawsers with a scope of 15 fathoms. The barge Mary H. was in the head tier on the port side, and the barge Francis L. Crowe in the head tier on the starboard side. The overall length of the tow was at least 350 feet.

2. At this time Prospect II was drilling out a steel barge (the Cape Jeff) from the northerly end of the rack at 96th Street, Manhattan. Cape Jeff is 133.9 feet long; her beam is 34 feet and her depth 15.5

feet. She was fully laden, and was moored on the inshore side of two other barges with her stern upstream.

3. The tide was flood and there was a twenty-five mile breeze from the southwest. The force of the current was about 4 knots in the East River and about 2 knots in the Harlem River.

4. As Patience approached with her tow, Prospect II put a headline on the starboard stern corner of Cape Jeff and backed out. She then shifted the headline to the port stern corner of Cape Jeff and straightened the barge out in the stream. She then cast off, and came along the port side of Cape Jeff, running a bow line to a cleat on the port forward quarter of the barge, and a strap from the barge's port quarter cleat to a bitt forward on the starboard side of Prospect.

5. During this operation, and before Prospect II had secured a stern line on Cape Jeff, Patience and her tow continued to approach on a northerly course about 300 feet to the east of the ferry rack on the Manhattan shore. When Prospect II and her tow, still not completely secured, were approximately dead ahead Patience rounded to on left rudder. As a result of this maneuver, and the following wind and tide, the forward starboard corner of Francis L. Crowe swung into the bow of Cape Jeff, and approximately at the same time Patience tripped around and damaged the port side of Mary H. The collision occurred about 300 feet to the east of the northerly end of the 96th Street rack.

6. The case was one of special circumstances. No whistle signals were exchanged except danger signals in the jaws of collision, and Patience at all times knew that Prospect II was out of control. Patience also knew that Prospect II ultimately intended to shape a course to the northward of Mill Rock bound for Port Morris.

7. Patience was at fault because of her failure to give sufficient consideration to the condition of the wind and tide, and in executing a round to in water where Prospect II was attempting to get under way with a large loaded barge which was not under control.

8. There was no fault on the part of Prospect II.

### Conclusions of Law

1. Patience was solely at fault; there was no fault on the part of Prospect II.

2. Libelant is entitled to a decree in appropriate form against Patience; Prospect II is entitled to a dismissal of the libel.