MANHATTAN LIGHTERAGE CORP. v. UNITED STATES.

UNITED STATES v. MANHATTAN LIGHTERAGE CORP.

THE BETTY LEE.

THE ROBERT BATTEY.

United States District Court
S. D. New York.
July 2, 1951.

Burlingham, Veeder, Clark & Hupper and Stanley Wright, all of New York City, for Manhattan Lighterage Corp.

Irving H. Saypol, New York City, Eugene Rheinfrank, New York City, for United States of America.

Hill, Rivkins & Middleton, T. H. Middleton, and J. J. Killea, all of New York City, for Joseph Auditore Stevedoring Corp.

BONDY, District Judge.

Libel to recover damages by the Manhattan Lighterage Corporation, as owner and operator of the Steamlighter Betty Lee, against the United States, as owner of the S.S. Robert Battey. The United States impleaded the Joseph Auditore Stevedoring Corporation, and also filed a cross-libel against the Manhattan Lighterage Corporation.

On November 20, 1944, the Government-owned Liberty ship Robert Battey was moored on the north side of Pier 1, in the public slip between Municipal Piers Nos. 1 and 2, in the Hudson River, with her bow towards the New York shore and her stem about 10 to 20 feet from the bulkhead. The Battey had an overall length of 441.8 feet, and a beam of 57 feet.

Parallel to the Battey, and about 15 feet to the north of her port bow, there was moored the steamlighter Betty Lee. Her stem was at the bulkhead, about 90 feet to the north of Pier 1, where one of several hydrants is maintained by the City of New York for the convenience of tugboats and other vessels.

At the easterly end of the slip, Pier 2 projected into the slip 130 feet southwards for a distance of 140 feet westwards of the bulkhead, thereby reducing the slip to a width of only 240 feet at its shoreward end. Pier 2 on the north side of the slip was about 655 feet long; Pier 1, which constituted the southern side of the slip, was 450 feet long.

The Betty Lee had an overall length of 85.5 feet, a beam of 29 feet, and a mast forward of the pilothouse 65 feet in height, to which was attached a boom 68 feet long. The height of her cargo deck above the water line was 5 feet 2 inches. Counsel for libellant stated that he had measured the height of the pilothouse's floor above the cargo deck, and found it to be 7 feet.

About 1:00 P.M. that day, stevedores in the employ of Joseph Auditore Stevedoring Corporation, the respondent-impleaded, began to rig the Battey in preparation for discharging dunnage from holds 1 and 2 and ballast from hold 4 into lighters or barges which were expected alongside later that day. The stevedores accordingly lowered to an angle of about 45 degrees over the Battey's port side one boom from each of the three masts. A qualified witness testified that the naval architect's plan shows that when a boom is swung outwards and

276

lowered to an angle of 45 degrees, it extends about 14 feet beyond the ship's side.

After finishing their rigging at about 3:30 P.M., the stevedores awaited arrival of the scows or barges. At about 4:45, their foreman received word that they should not wait longer but should leave the vessel for the night. Despite testimony of some witnesses that they did not observe any cluster light, the court believes there was a cluster light affixed on the Battey's port railing off No. 4 hatch before the stevedores left, to direct any scow which might arrive during the night to the place at the Battey's side at which to make fast. The floodlights on the Battey's masts were also turned on at dusk and illuminated hatches and deck. However, these floodlights were not affixed at the top of the masts, but on a level considerably below the top part of the outswung booms, and thus did not illuminate the farther part of those booms. These floodlights appear to have been equipped with reflectors, which probably focussed their rays on the hatches and deck and not on the ship's sides.

About 6:00 P.M. that day, Captain Rajner Raner took command of the Betty Lee. He had never before been aboard that lighter. The Betty Lee cast loose from the bulkhead some time after 11:00 P.M. The night was dark, the sleet and rainfall heavy, the wind northeast at about 19 miles an hour, and the tide slack flood.

Besides her master, the Betty Lee was manned by an engineer, a deckhand and two firemen. The deckhand was not acting as lookout while the lighter was leaving the slip, but remained in the galley. The engineer and firemen were in the engineroom. The only eyewitness to the Betty Lee's maneuvers after she cast off was her master, Captain Raner. Although his deposition is not clear, it appears to have been his recollection that when the Betty Lee started to leave the bulkhead, two or three other harbor craft, perhaps tugs and barges, were moored at the bulkhead north of his lighter and south of the projection of Pier 1. Captain Seller, a disinterested witness, who on the night in question was in command of the tug Dalzellance, testified that his tugboat had been at the bulkhead between Piers 1 and 2 at 11:15 that night. Thus it appears that there was at least one craft lying at the bulkhead between the Betty Lee and the projection at the inshore end of Pier 2.

Captain Raner apparently backed the Betty Lee to port and then went ahead to starboard. It is not clear whether there was only one movement astern and one forward, or whether there were repeated backings and fillings. In view of the limited space, the latter seems more probable. While proceeding ahead, and, according to Raner's deposition, close-shaving the Battey's port side with a clearance of only six inches to a foot, the Betty Lee's mast and boom struck either the guy wire securing the boom or the boom itself which projected from the Battey's mizzenmast abaft the number 4 hatch beyond the Battey's side. The collision broke the Betty Lee's mast, which fell backwards and damaged the pilothouse, and bent the Battey's boom. The Betty Lee then proceeded under her own power to the Jersey City Drydock.

Section 409 of Title 33 of the United States Code Annotated provides: "It shall not be lawful to tie up or anchor vessels or other craft in navigable channels in such a manner as to prevent or obstruct the passage of other vessels or craft * * *." A slip between private piers is a navigable channel within the meaning of the statute. National Forwarding Co. v. Payne, etc., D.C., 297 F. 663. All the more, the waters in a slip between two public piers must be deemed part of the navigable channel.

The Court of Appeals for this Circuit held liable for obstructing navigation a dredge which, while moored in a channel almost twice as wide as the slip here involved, permitted its anchor to hang downwards into the water but apparently not out beyond its side. The Overbrook, 2 Cir., 142 F. 950, 952. The court stated: "The test of responsibility for so exposing such a vessel (one lying at a pier) or its tackle that it is liable to injure another vessel is whether it is a 'dangerous exposure'; that is, 'an exposure that is clearly liable to receive, or inflict injury in the ordinary chances, mistakes, or hazards of navigation,

such as are to be reasonably apprehended as liable to arise.'" Citing The Mary Powell, D.C., 31 F. 622, affirmed C.C., 36 F. 598.

█ The slip between public Piers 1 and 2 was an exceedingly busy one, frequented by tugs, scows, barges and stick lighters like Betty Lee; and on its bulkhead hydrants were maintained for the convenience of harbor craft. The Battey, with her 57 foot beam, had already reduced the available space in the slip to about 310 feet at its western, offshore end, and to about 180 feet at its eastern, inshore end, and in these 180 feet of space still remaining at the bulkhead were moored the Betty Lee, the tug Dalzellance, and perhaps, if Raner's recollection was reliable, two other harbor craft. The eastern end of the slip thus was crowded, and it was an unjustifiable obstruction to navigation on the Battey's part to take up 14 feet more of the space to her port side, and thereby to make the part of the slip under these booms either unavailable or highly hazardous for stick lighters and other craft with masts. The court concludes that the failure to swing the booms inboard after it became known that they would not be used that night constituted a clear violation of 33 U.S.C.A. § 409, supra.

█ The court also concludes that the Battey's failure either to swing the three booms inboard or else at least to give effective notice and warning of their presence, 60 feet or more above the water, to craft lying as low in the water as the Betty Lee, was unreasonable and imprudent, and involved an unjustifiable risk of injury to such craft. The omission must be considered in the light of the fact that the public slip was busy, the night dark and the weather bad. The attention of a pilot whose eyes are only about 18 feet above the water would normally be concentrated on the surface of the water, especially while maneuvering in a close and crowded slip, and not on points more than 40 feet overhead, and more than 60 feet above the water; and the Battey knew, or should have known, that her booms, left in such an unexpected place in the dark, constituted a hazard to craft lying low in the water. The testimony showed that when a vessel is lying at an even keel, a single man can swing inward a boom such as the Battey's in ten minutes at most, and two men in less than half that time. The hazard that resulted from leaving the booms out was out of all proportion to the labor involved in swinging them inboard.

On the present record the court is unable to find that there was any custom in the Port of New York during the war to leave booms projecting out overboard at night. It was the duty of those in charge of the vessel to see that she was shipshape and that the booms were swung inboard; and the failure to do so, or at least to give adequate warning of their presence some 60 feet or more above apparently unobstructed water, constituted negligence, aside from the statutory violation.

█ The Betty Lee's fault is clear. It is apparent that Raner started to back to port as soon as the Betty Lee had cast off, instead of backing out until he reached at least the broader, unobstructed offshore part of the slip where he could then have turned safely. According to Raner, he close-shaved the after part of the Battey with a clearance of only six inches to a foot. Scale models in evidence tend to show that the Betty Lee could scarcely have followed the course indicated by her master. However, since the lighter had a 29 foot beam, and since the booms projected 14 feet beyond the Battey's port side railing, and making allowance for the fact that her sides probably sloped inwards towards the water line, it is clear that the Betty Lee must have come within a very few inches of the Battey's side to make it possible for her mast to strike the boom; and the court concludes that the Betty Lee's navigation was clearly negligent.

Since the booms were so far above the level on which a lookout's attention would normally be fixed, it seems doubtful whether the Betty Lee's failure to have a lookout was a contributing cause of the accident. Nor is the court able to find upon the record that her master in fact had actual knowledge that the freighter's booms were swung overboard.

The government contends, however, that even if the Battey was at fault, her fault

was a condition and not a cause of the accident, and that she is therefore free of all liability.

The doctrine of last clear chance is applied differently in different jurisdictions. Some courts require that the defendant must actually have been aware of the danger, and thus have had a "conscious last clear chance" to avoid the ensuing accident; other courts hold it sufficient that the defendant, although not actually aware of the danger, should in the exercise of reasonable care have discovered it. Prosser on Torts, 411–412 (1941). It is not clear in which form the doctrine is applied to admiralty causes in this circuit.

The Cedar Cliff, 2 Cir., 1945, 149 F.2d 964 and The Watuppa, 2 Cir., 1941, 120 F. 2d 766, tend to indicate that it suffices that the defendant should have known of the danger, although he was not actually aware of it.

The interpretation which requires the defendant to have had actual knowledge of the danger finds support in the language in Southern Transp. Co. v. Dauntless Towing Lines, 2 Cir., 1944, 140 F.2d 215; Sanday-Michigan, 2 Cir., 1941, 122 F.2d 325; The Syosset, 2 Cir., 1934, 71 F.2d 666; The Perseverance, 2 Cir., 1938, 63 F.2d 788. See also, in general, Petterson Corp. v. N. Y. Central R. R. Co., 2 Cir., 1942, 126 F.2d 992, 1942 A.M.C. 345; Ryan v. Dendinger, La.App., 1 Cir., 1941, 2 So.2d 263, 1942 A. M.C. 1004.

■ The best authority for the respondent and cross-libellant is The Cedar Cliff, supra. In that case, however, the opinion of the Court of Appeals casts doubt as to whether the libellant's moored position, indicated by proper lights, constituted any fault at all. To apply the doctrine of last clear chance to the present case, where the court can not find that Raner had actual notice of the danger, and where there is some doubt whether reasonable care on the part of the master and of a lookout would have revealed an obstruction so far overhead and in so unexpected a place, would be to extend beyond any previous application in this circuit an exception which seems to have developed through dissatis-

faction with the common law rule of contributory negligence. Prosser, op. cit, 416. Therefore both vessels must be held to have been at fault and the damages must be divided. See Robinson on Admiralty, 854–855. Accordingly there will have to be a reference to a Commissioner to determine the damages to both vessels, unless the parties can agree on the respective amounts.

■ Neither upon the trial nor in its briefs has the government contended that the collision was in any way due to any fault on the part of Auditore Stevedoring Corporation. It was the vessel's duty to swing her booms inboard, and not that of the stevedores. Accordingly, the libel against the respondent-impleaded is dismissed.

The foregoing shall constitute findings of fact and conclusions of law unless the parties desire more detailed findings, in which event they may be submitted upon notice.

Submit decree in accordance with this opinion.