William H. WILLIAMSON, Libelant,

v.

THE Tug CAROLINA and THE Barge BALTIMORE, their engines, tackle, apparel, and furniture, in a cause of action civil and maritime, for tortious damage, in rem, Respondents.

No. 399.

United States District Court,
E. D. North Carolina,
Wilmington Division.

Jan. 20, 1958.

Rountree & Rountree, Wilmington, N. C., for libelant.

James & James, Wilmington, N. C., for respondent.

GILLIAM, District Judge.

In this case the libelant seeks to recover for damages resulting from the displacement swells caused by the respondents. These facts are found:

The Clara Rose was a shrimp boat. Her length was 41½ feet, her beam 12½ feet, her draft 3 feet 8 inches, her mast approximately 16 feet long.

Gause's landing is located on the Inland Waterway a few miles to the southwest of Southport, North Carolina, at a point where Gause's Creek empties into the Inland Waterway and the sound. At that point the Inland Waterway runs approximately east and west. Gause's Creek empties into the Inland Waterway at an angle of about 45 degrees from the northward, and curves to the right as one looks northwardly, ultimately running parallel with the Inland Waterway. Gause's Landing is to the north of the Inland Waterway and to the west of Gause's Creek, and the shoreline is a rounding curve to the north as one faces eastwardly looking up the Inland Waterway. There are several large oaks growing on the landing, and the land on the point is somewhat elevated.

On the western shore of Gause's Creek, about 100 or 150 yards northwardly from the point where Gause's Creek empties into the Inland Waterway, is a sloping shore or beach, with several large oak trees standing onshore, and at this place, on the morning of July 6, 1956, at approximately 6:15 o'clock, or shortly thereafter, the shrimp boat Clara Rose was beached by libelant, her owner.

The purpose of beaching the Clara Rose was to scrape and paint the bottom. At the time she was beached, the tide had reached its peak and had just begun to fall. She was beached with her bow to the north at an angle of about 45 degrees with the shore line, and at about right angles to the Inland Waterway. At the time she was beached, her whole keel was resting on the bottom. Gause's Creek is a comparatively shallow creek, having a depth of about four feet. A line with a block and tackle was run from the top of the mast to a tree on the shore and the Clara Rose was careened to the port side so that when the tide fell, the bottom on the starboard side would be exposed and could be scraped and painted. There was a 45-lb. mud hook anchor from the bow, but no line or anchor from the stern. The Clara Rose was left in this position, with the line from the top of the mast holding her on her port side, awaiting the fall of the tide.

The Inland Waterway was designed and constructed by the Government for inland water transportation up and down the coast, and is so used, various types of boats, barges and tugs—including oil barges similar to the Baltimore pushed by tugs similar to the Carolina—regularly navigating up and down the Inland Waterway.

420

The barge Baltimore is of 1,107 gross tons, overall length 210 feet, width 34½ feet, and draft 8 feet.

The tug Carolina is of 139 gross tons, overall length 100 feet, width 22 feet, draft 10 feet.

At about 7:15 a. m. on July 6, 1956, in excellent weather, when the tide had been falling about an hour, and had fallen about a foot at Gause's Landing, the tug Carolina pushing the barge Baltimore on its way from Charleston, South Carolina, to Norfolk, Virginia, approached Gause's Landing. The barge was about one-third loaded and was probably drawing 3 feet forward and 5 feet aft. The speed of the tug and barge was 7½ to 8 statute miles per hour. Such speed is normal and ordinary for comparable tugs and barges operating in the Inland Waterway. The displacement waves at that time resulting from the movement of the tug and barge were normal and of the size one would expect to encounter. The wheelhouse of the Carolina was occupied by her master and W. R. Melton, the latter acting as lookout. There was no lookout forward on the barge.

When the tug and tow were approximately 300 yards from the mouth of Gause's Creek, the libelant ran to Gause's Landing, at the mouth of the creek, and attempted to warn the tug of the precarious position of the Clara Rose by waving his cap in a frantic manner. This signal went unobserved. The libelant, when signaling, was about 100 yards from the Clara Rose, and both he and the Clara Rose were in such a position that they could have been detected by a diligent lookout in time to have slowed the tug and barge, thereby reducing the size of the displacement waves, before reaching the mouth of Gause's Creek.

As the tug and barge passed the mouth of Gause's Creek, the displacement waves caused the Clara Rose to rise in the water. Because the vessel was careened to port and secured by a line from the mast boom to a tree, the rising water had the effect of suddenly careening the vessel further to port. The increased strain on the mast line, because of the change of the position of the vessel's center of gravity, caused the line to break with a resulting lurch to starboard. As a consequence of being so thrown about while aground, the vessel suffered damage to her rigging, radio, planking, and keel. The damages caused the vessel to be out of commission for 8 weeks during the shrimping season. The libelant worked, on and off, a period of three weeks making repairs.

■ With regard to the Clara Rose, it is the opinion of the Court that the libelant moored her in an unseaworthy manner. The displacement waves of the tug and barge were normal and to be reasonably expected. The Clara Rose had no stern line secured which would have prevented her from swinging in the water. The line from her mast to the tree onshore was taut, and she was well aground. Such a mooring, only 150 yards from the Inland Waterway, prevented her from riding with the swells, and consequently increased the strain on the mast line to the breaking point. The danger of the vessel's breaking this line, upon receiving swells, with a resulting lurch to starboard and its consequent damage was foreseeable by an ordinary prudent man versed in maritime activity. The unseaworthy mooring contributed directly to the damages suffered by the Clara Rose. A duty exists on a ship to be seaworthy and moored in such a manner that a situation will *not* be created whereby ordinary and reasonable swells created by a passing vessel in such a locale will result in damage to the moored ship. Martin Marine Transportation Co. v. United States, D.C., 66 F.Supp. 673, 676, citing The Savoie, D.C., 157 F. 312; The St. Paul, D.C., 171 F. 606; The Favorita, D.C., 43 F.2d 569; The Alexander Hamilton, D.C., 4 F.Supp. 258.

With regard to the tug Carolina and the barge Baltimore, the libelant urges a negligent failure to maintain a proper lookout either because there was no lookout on the bow of the barge or because of a lack of diligence on the part of the lookout in the wheelhouse.

■■ Speaking to the libelant's first contention, the cases considering the proper position of a lookout are not reconcilable. This Court adopts the view that, although generally the lookout should be as far forward as possible, the propriety of the lookout's position must be determined in view of all the surrounding circumstances—size of ship, speed, weather conditions, type of channel, amount of commerce in the area, time of day, etc. See The Mamei, 3 Cir., 152 F.2d 924. In the case at bar the tug, travelling in the daytime under excellent weather conditions, was pushing the barge, and the wheelhouse of the tug was sufficiently elevated to afford excellent observation in all directions. The instant portion of the Inland Waterway is free from navigational hazards and is subject to relatively light commerce. It is the opinion of the Court that under these circumstances the lack of a lookout forward on the barge did not constitute a failure to maintain a proper lookout.

■ The libelant's second contention, however, is another matter. The Clara Rose in its precarious position and the libelant when signaling were within view for over some three or four hundred yards down the Inland Waterway to the westward. The tug's failure to detect either the libelant or the Clara Rose as the tug approached Gause's Creek can only be attributed to a lack of diligence, and the Court therefore finds the respondents negligent in failing to maintain a proper lookout.

■ The libelant urges that failure to maintain a proper lookout is a statutory fault within the rule of The Pennsylvania, 19 Wall. 125, 22 L.Ed. 148, which holds that a vessel guilty of violating a statutory rule must, in order to be free from blame, show that the violation not only probably did not, but could not have contributed to the injury complained of. This contention is predicated on the argument that maintenance of a proper lookout is made a statutory rule by virtue of 33 U.S.C.A. Sec. 221, which reads as follows:

"Nothing in these rules shall exonerate any vessel, or the owner or master or crew thereof, from the consequences of any neglect to carry lights or signals, or of any neglect to keep a proper lookout, or of the neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case."

It appears to this Court that the correct and simple interpretation of this section is merely that compliance with the statutory rules set forth immediately preceding the section quoted above is not in any way to alter the duties of good seamanship which existed prior to the enactment of the statutory rules. The effect of the section is in no way to codify the duties of good seamanship. If the latter were true, then the burden of proving proximate cause, historically resting on the libelant, would be shifted to the respondents, for every violation of the historical duty of good seamanship would be a statutory fault, and, under the rule of The Pennsylvania, the respondents would have the burden of proving that such violation could not have caused the injury of which the libelant complains.

But independent of the matter of statutory fault and the rule of The Pennsylvania, supra, it appears to the Court that the conclusion contended for by the libelant is correct. Common sense clearly indicates that maintenance of a proper lookout is essential to maritime commerce, and its lack is bound to precipitate collision. Generally, failure to maintain a proper lookout is a fault contributing to maritime injury, and the facts proving otherwise are usually within the sole knowledge of the negligent vessel. With this in view, it has often been held that the failure to maintain a proper lookout, though not decisive of fault contributing to tortious injury, raises a presumption of fault against the negligent vessel which can only be overcome by proof beyond a reasonable doubt that such fault did not contribute to the injury. Ira S. Bushey & Sons v. United States, 2 Cir., 172 F.2d 447; Martin Marine Transpor-

tation Co. v. Jakobson & Peterson, 2 Cir., 135 F.2d 325; The Madison, 2 Cir., 250 F. 850. See also The Albert Dumois, 177 U.S. 240, 20 S.Ct. 595, 44 L.Ed. 751.

 The tug Carolina and the barge Baltimore, therefore, have the burden of proving that their failure to maintain a proper lookout did not contribute to the libelant's injury. Upon the evidence presented, this burden has not been sustained. The respondents admit that had the Clara Rose been observed from a point three or four hundred yards from Gause's Creek, its precarious position would have been appreciated and the speed of the tug and tow slowed in order to reduce the size of the latter's displacement waves. Rather than show that the respondents' improper lookout did not contribute to the libelant's injury, the evidence affirmatively indicates that the improper lookout was directly a contributing fault.

 The libelant urges that the admiralty rule of divided damages should not apply, and that either the major and minor fault rule or the doctrine of last clear chance should result in his full recovery. Inasmuch as the negligence of both parties has been fully established and shown to have equally and directly contributed to the libelant's damage, the Court regards the major and minor fault rule inapplicable to the instant case.

 The applicability of the doctrine of last clear chance presents a more clouded legal question. At common law contributory negligence historically prevented recovery. This result was harsh where the contributory negligence was a minor factor of causation. In addition, it was justifiably felt that the first party's fault was of greater magnitude where his negligence and its resulting damage occurred subsequent to the discovery and awareness of the second party's negligently caused but helpless position. The law has always innately recognized that the ordinary prudent man should and generally would exercise a higher quantum of care in his contracts with those unable to help themselves. The violation of the higher quantum of care was re-garded as more nearly the proximate cause of the injury, and these views resulted in the doctrine of last clear chance. The doctrine originally applied only to those cases in which the first party was negligent subsequent to his actual discovery and awareness of the second party's negligently caused helpless condition; but later cases extended the doctrine to those cases in which the first party's negligence prevented his discovery and awareness of the second party's plight. This extension has been criticized for the reason that until the peril was discovered, the first party had no reason to increase his quantum of care, and thus the magnitude of his fault was in no way increased. As phrased in Keller v. Norfolk & Western Ry. Co., 109 W.Va. 522, 156 S.E. 50, 52:

"The logic of the doctrine of the last clear chance calls for actual knowledge so that impending injury may be averted. Imputed knowledge affords no such clear chance. Why indeed should knowledge be imputed to the defendant without also imputing it to the plaintiff? Why mete out a measure to one litigant different from that to the other? Why should justice thus discriminate? Is the duty of one to preserve himself from injury less than the duty of another to so preserve him?"

Nevertheless, the extension of the doctrine of last clear chance to the situation of "discoverable peril" has remained. The justification of the doctrine as applied to the "discoverable peril" situation perhaps rests upon the feeling that the first party's negligence is a proximate cause at least equal to if not greater than that of the negligence of the second party. Whether or not the doctrine of last clear chance is applied to the "discoverable peril" situation, it is manifest that at times an unjust conclusion is reached, for frequently one party must bear a loss equally occasioned by the negligence of both. Until the common law recognizes an apportionment of damages, the subject will remain the object of much legal criticism.

 Focusing one's attention to the field of admiralty, a different situation presents itself. The major and minor fault rule prevents contributory negligence from barring recovery where such negligence is a minor or negligible factor of proximate cause. Where the contributory negligence is a cognizable factor of proximate cause, (thus not disregarded under the major and minor fault rule) the admiralty rule of divided damages avoids the unjust common law result of placing on one party a loss occasioned by the negligence of both. True, the loss is not borne pro rata according to fault, but on the whole the rule of divided damages seems to achieve a just result.

Originally the doctrine of last clear chance was not applied in admiralty in the United States. As stated in The Norman B. Ream, 7 Cir., 252 F. 409, 414:

"* * * that rule, in mitigation of the common-law principle that makes even the slightest contributory negligence a bar to recovery, is not applicable in this country in admiralty, where contributory negligence effects only a division of liability."

See also The Steam Dredge No. 1, 1 Cir., 134 F. 161, and cases cited therein. The first admiralty cases found by this Court which recognize the doctrine of last clear chance are The Wattupa, 2 Cir., 120 F.2d 766, and The Sanday, 2 Cir., 122 F.2d 325. Neither contain a discussion indicating the reason for the departure from the former admiralty rule. Later admiralty cases tacitly or expressly recognizing the doctrine of last clear chance are: The Sakito Maru, D.C., 41 F.Supp. 769; The Mary H., D.C., 67 F.Supp. 335; Manhattan Lighterage Corp. v. United States, D.C., 103 F.Supp. 274; Hertz v. Consolidated Fisheries, D.C., 105 F.Supp. 948; In re Adams Petition, D.C., 125 F.Supp. 110; Pure Oil Co. v. The F. B. Walker, D.C., 127 F.Supp. 867; Chicago, Burlington & Quincy R. Co. v. W. C. Harms, D.C., 134 F.Supp. 636; Indian Towing Co. v. The M/V Suwanee, D.C., 139 F.Supp. 547; Kosnac v. The Norcuba,

D.C., 142 F.Supp. 377; The Cedar Cliff, 2 Cir., 149 F.2d 964; P. Doughtery Co. v. United States, 3 Cir., 207 F.2d 626; J. S. Gissel & Co. v. Dixie Carriers, 5 Cir., 219 F.2d 233; Crawford v. Indian Towing Co., 5 Cir., 240 F.2d 308; and Kosnac v. The Norcuba, 2 Cir., 243 F.2d 890. In all cases cited immediately above, it appears to this Court that the major and minor fault rule could have been applied and the same results achieved; for as long as the negligence of the libelant is a minor or negligible factor of causation, it is immaterial whether the rule of law applied in order to relieve the libelant is called major and minor fault or last clear chance. Likewise, where, although the libelant's negligence as a factor of causation is apparent, the respondents' negligence is so gross that justice requires he should bear the entire loss, the major and minor fault rule can and should be considered in the relative setting to achieve such a result, but, since the result is the same in either case, it is immaterial whether the major and minor fault or last clear chance label is used. It might be noted that situations involving "discoverable peril" would generally fall within this latter category.

 A different matter is presented, however, where the injury is occasioned by the negligence of both parties, and yet the negligence of neither party has been so gross as to justify his bearing the entire loss. The common law does not recognize such a situation, and, being a child of the common law, neither does the doctrine of last clear chance. Although an injury is equally and clearly occasioned by the negligence of both parties, the loss, under last clear chance, is *always* borne by one party alone. Such a result may be called for in the common law which knows no apportionment of damages, but it is unjust and has historically been avoided in admiralty by the more equitable rule of divided damages. An extension of the common law doctrine to the situation in which the injury is *equally* occasioned through the negligence of both parties, *although the negligence of*

one occurs *subsequent in time,* would to that extent do away with the rule of divided damages. Such an abrogation would constitute a regression in the field of law, and it is the opinion of this Court that in such circumstances the doctrine of last clear chance does not apply in admiralty.

The instant case involves the "discoverable peril" situation. From the foregoing it is apparent where the failure to discover the libelant's plight is the true proximate cause of the injury, or where it constitutes such gross fault as to justify the respondents' bearing the entire loss, the substance of the major and minor fault rule, (whether called by that label or that of last clear chance) may be relied upon to reach the conclusion justice requires. Where the failure to discover the libelant's plight is *only one of several equally contributing causes of the injury,* the doctrine of last clear chance, which would totally disregard the proportion of blame, is not applicable, but gives way to the historic admiralty rule of divided damages which will more justly apportion the loss. This view finds support in the following cases: Kosnac v. The Norcuba, 2 Cir., 243 F.2d 890; J. S. Gissel & Co. v. Dixie Carriers, 5 Cir., 219 F.2d 233; Manhattan Lighterage Corp. v. United States, D.C., 103 F. Supp. 274; Hertz v. Consolidated Fisheries, D.C., 105 F.Supp. 948.

In the case at bar, the libelant's injury was clearly caused by the negligence of both parties. Inasmuch as the respondents were unaware of the libelant's helpless condition and the consequent duty to exercise a higher quantum of care, it is the Court's opinion that the respondents were not so grossly negligent as to justify their bearing the entire loss. Therefore, neither the doctrine of last clear chance nor the rule of major and minor fault applies, and the libelant's damages are to be divided between the parties.

We come then to the matter of damages sustained by libelant. Such includes actual damage to the Clara Rose and loss of its use during the period it was out of service.

The libelant's evidence establishes the following physical damages to the vessel:

One plank on her starboard side, the chine plank, was completely holed, about 15 feet forward of the stern; two planks on the port side were cracked about 12 feet aft of the bow and about one-third of the distance from the chine line toward the keel and downward; there was a piece 1½ feet long and 3 inches wide, completely broken out of the bow; her keel, made of one piece of heart pine, with no inner and outer keel, was twisted and turned over about 2 inches; 2 boom guy lines were broken; the radio antenna was broken; the radio was damaged. The respondents offered no evidence on the question of physical damages.

Libelant valued his vessel before the accident at $5,000 and estimated its value thereafter and after repairs made by him at $3,000. The repairs were accomplished after three weeks of labor by libelant and for such repairs he claims $240, or $2 per hour for 120 hours. Respondents offered no evidence as to value before or after. However, there are certain facts established by the evidence which should be borne in mind when attempting to fix the quantum of physical damages to the Clara Rose. She was six years old at the time of the accident and had been substantially damaged in 1955. At that time the wheelhouse and some planking on the port side were torn off and the planking replaced just before the incident here involved. Besides, I feel that on an issue of this nature, which is a precarious one at best, where the evidence comes solely from the party claiming the damages because the opposing parties are not in position to make any proof at all, it is well to have in mind that it is the nature of a human being generally to hold an exaggerated view of the amount of his claim. With these matters in mind I fix the amount of the damages to the Clara Rose at $1,500. This includes the claim of $240 for libelant's labor and expenses of repairs.

It is not disputed that, if the libelant is entitled to prevail, he should recover, in addition to the damages to his vessel, a fair and reasonable amount for loss of its use, provided the evidence is sufficiently strong and clear to furnish the basis for a reasonably accurate estimation of such loss. Certainly, under modern authorities the mere fact that the amount of such loss is not precisely shown should not mean that no recovery is allowed, when it is apparent that there has been some loss. The damaged vessel was being used by her owner to take shrimp and the damages sustained disabled her for eight weeks during the shrimping season of 1956. In my opinion, libelant's evidence makes a case for recovery of damages for loss of use.

In The Potomac, 105 U.S. 630, at pages 631, 632, 26 L.Ed. 1194, it is written:

> "In order to make full compensation and indemnity for what has been lost by the collision * * * the owners of the injured vessel are entitled to recover for the loss of her use, while laid up for repairs. * * * When there is no market price, evidence of the profits that she would have won if not disabled is competent; * * * in no event can more than the net profits be recovered by way of damages * * *"

See The Conqueror, 166 U.S. 110, 17 S.Ct. 510, 41 L.Ed. 937. As there was no market value for the use of the Clara Rose, resort must be had to evidence of probable net earnings during the period of her disability had such not come about. Libelant expressed the opinion that he would have netted $3,500 during the eight weeks involved, but I feel sure that this opinion is too optimistic. It is true that the evidence shows the 1956 shrimping season was a good one; even so, it is fair to assume that libelant has resolved all doubts as to weather, the runs of the shrimp, and other factors involved in his favor. Human experience teaches us that such attitude is not the proper one. Certainly, it would not be proper in a situation like this where the burden of proving the amount of damages rests upon the libelant. He offered no books and gave no breakdown of his estimate; he only stated he thought he would have made $3,500 net profit, but failed to give any estimate of the quantity of shrimp he might have taken, the prices he might have received, and the expense to which he would have been put. While it is clear that there was some loss, it is equally clear it was not as great as contended. It is my view that an estimate of $1,750 is fair to libelant.

It is my finding that the total of damages sustained was $3,250. As hereinbefore stated, under the law libelant is entitled to recover half of this amount. A formal judgment to this effect will be submitted by proctor for libelant.