A. D. KENAMOND, Judge.
Claimant Mary J. Martin, duly qualified administratrix of her deceased husband’s estate, represented that on January 12, 1951, at about nine o’clock in the morning, said husband, James F. Martin, was driving a 1946 model Chevrolet 1% ton truck, owned by Lowry Moser, then a passenger in said truck, along old u. s. 50, about Vz mile east of the city limits of Clarksburg, and that on a decided downgrade the vehicle struck a badly broken portion of the highway, causing it to swerve to the left into a deep slide at the left edge of the paved portion of the highway, thence over an embankment to the the bottom thereof, whereupon the said James F. Martin was instantly crushed to death.
Claimant seeks $10,000. for the wrongful death of her husband, charging negligence on the part of the state road commission for knowingly permitting this hazardous condition to exist for a long period of time, and failing to maintain any guardrails or warning signs.
*52 When this case was called up for hearing on October 10 in the Harrison county courthouse in Clarksburg, and before any evidence was heard, the court and counsel for claimant and for respondent adjourned to the scene of the accident, approaching the scene from the upper side and taking the same route that the deceased took.
Turning off New-u. s. 50, a three-lane highway comparatively new and of superior construction, and sharply to the left into Old. u. s. 50, a two-lane macadam or blacktop road approximately sixteen feet in width in its wider and normal stretches, and proceeding along its curves and changing grades, we felt that a driver of a motor vehicle would normally be alerted to keep his eyes on the road and open to any possible danger that might be ahead.
From the viewing it was possible to determine, from the repair and new surfacing of the broken portion of the highway, both the surface area and shape of the break, but not the depth of the break at the time of the accident. The deep slide or breakoff extending straight downward to a depth of three or more feet, at the very edge of the left lane of hard surface was still there, and no guardrail had been erected for the protection of any driver who might under certain conditions of traffic be pressed over to the berm normally maintained along the course of that lane.
The hearing of the case resulted in a feeling on the part of the court that everything was conspiring to take the life of James F. Martin, leaving a widow and two children who are deserving of the deepest sympathy.
The state road commission was under no mandate of law, in view of the Supreme Court decision in the Adkins case, 130 W. Va. 646, to maintain guardrails and warning signs, but in the matter of proper maintenance of the two-lane highway appears to have shown indifference, if not actionable negligence.
On the other hand, James F. Martin seems to have concurred and cooperated with the state road commission in bringing on the accident by choosing the more dangerous of two alternate routes, *53 by giving little attention to the road over which he was passing, and by driving when his physical state was not at its best.
Let us examine the facts in the case, insofar as they are revealed by the testimony, first considering the conduct of the state road commission with respect to the requirement “That the highways be kept and maintained in a reasonably safe condition for travel with ordinary care and in the ordinary mode by night and by day.” (See note, Code 1597 (9), citing Corbin v. Huntington 74 W. Va. 479, and Reynolds v. Milton 93 W. Va. 108). Testimony showed that the broken portion of the highway was in the shape of a triangle extending across both lanes, but wider and deeper (variously estimated at 7, 8, 10, 12 or 14 inches) on the left going down, and that, because of the break in the left lane, the traffic was using the right-hand side of the road, getting onto the berm wholly or with the left wheels on the shallow-break in the outer portion of the right lane.
The road maintenance superintendent for Harrison county had experienced trouble with this break or dip over the entire four years of his service in that capacity. The roadway would go down at least once a year and possibly two or three times in a given year. At first he used cinders to fill up the dip, but finally got to using crushed rock, which repair he regarded as more or less temporary. The repair made after the accident, in the judgment of the court viewing same, was of a more or less permanent nature and such repair could reasonably have been made with some saving of the expense required under the plan of repeated temporary repairs.
Trooper W. A. Wood, who visited the scene of the accident within a few days thereafter, stated that “the break was a hazardous condition,” but the maintenance superintendent testified that he “wouldn’t say it would be particularly hazardous.” Between the street commissioner of Clarksburg and the maintenance superintendent for the road commission they managed to keep the break in such condition that the city garbage trucks and other vehicles would not find it impossible to use the road by keeping well to the right going down. It was not a pretty situation at best, *54 but fortunately no serious accident had occurred there before that in which James F. Martin lost his life. On numerous occasions a driver going down the hill from the Wonder Bar, a night club at the top of the hill, would get a wheel off the road and blow a tire, but, according to John Folio, Wonder Bar proprietor, many of his patrons went down over Old u. s. 50. Sometimes a garbage truck would be thrown down over the road, but the street commissioner would then take the driver off, because “the road was bad” and “because he had to be very careful with that big equipment on that road.” W. Howard Drummond, maintenance superintendent, evidently put great dependence on everyone exercising extreme caution because of knowledge of the bad condition of the road. There was, however, testimony to the effect that some indication of a break, and rutted arc of traffic to the right, could be observed 75 feet away, though the depth of the break could not be seen until a driver was “right up on it.”
As previously stated, James F. Martin seemed to concur and cooperate in bringing on the accident causing his death. Let us examine the testimony. The deceased had been employed as a truck driver hauling coal in the county for more than five years, without a wreck. He lived in Bridgeport, about three or four miles from the scene of the accident. Presumably, after driving a coal truck in the vicinity for more than five years and going about in his own Ford V-8 car, he would have known something of the bad condition on Old u. s. 50, but there was no testimony to the effect that he did. The fairest statement with reference thereto was that of his widow, who stated that she didn’t think he ever traveled Old u. s. 50, that he never did go over it when she was with him.
From about five-thirty o’clock of the evening before this accident until one-thirty o’clock in the morning Lowry Moser and another boy and girl were with James F. and Mary J. Martin at the Martin home, during which time all but Mrs. Martin indulged in beer and highballs, the whiskey being furnished by the visiting boy, but according to testimony, James F. Martin and Lowry Moser had only one highball or drink of whiskey each. Shortly after one-thirty o’clock the party broke up and James F. Martin *55 was in bed till four o’clock or four-thirty o’clock when Moser returned with a ham. By eight minutes before five o’clock, James F. Martin and Lowry Moser had partaken of fried ham and coffee and set out for “Bob’s place” over in Glen Elk, about six miles from the Martin home, for the purpose of delivering a ham. They stayed at Bob’s place till about eight o’clock, during which time Moser had a highball.
A sequel to this social period of some fourteen hours, during which the deceased had been in bed not more than three hours, was a report, dated January 13,1951, from W. R. Bennett, chemist, criminal identification bureau, Charleston, showing .15 of one percent of alcohol in the blood and stomach content of the deceased. Dr. Kenna Jackson, county coroner, who examined James F. Martin after he was killed, had the test made at the request of the Department of Public Safety, and stated that the report indicated a little more than a slight degree of intoxication, giving Dr. Lemoine Snyder, director of the police department of the State of Michigan, as authority for his statement.
While Moser and James F. Martin were out on u. s. 50, they decided to go to the P-K mine to see about coal. Testimony shows that Martin turned off onto Old u. s.. 50 of his own volition, without request or suggestion from Moser, and no one could more than conjetcure why he chose a route generally known in that area to be in poor condition when he might have traveled the improved New u. s. 50.
As Martin and Moser proceeded down Old u. s. 50, they were engaged in conversation, according to Moser, whose testimony as to whether they were watching the road was evasive, though he did say “He (referring to Martin) knew about where we were.”
Trooper W. M. Simon, called to investigate the accident resulting in the death of James F. Martin, made at least three statements that have a very material bearing upon the merits of the claim under consideration. Moser told him that the deceased had been drinking; his report showed “exceeding lawful speed,” but he explained that there was no other heading he could mark to show *56 “exceeding speed due to highway conditions,” and describing “the way and the direction the truck traveled from the time” in his opinion “it came into the rough spot on the highway,” and “it went some little distance there with two wheels over the berm on the left-hand side where the truck started skidding over the bank.”
Weighing all the facts from the testimony adduced in this case, the court is of the opinion that the deceased James F. Martin made such a contribution to the accident causing his death as could not be regarded as so indirect as to permit an award to the claimant in this case (Willhide v. Biggs, 118 W. Va. 160.)
In the case of Overby v. Chesapeake & Ohio Ry. Co., 37 W. Va. 524, we note:
“The general rule in regard to contributory negligence is that, if the negligence be mutual on the part of the plaintiff and defendant, there can be no recovery.”
Also, Otte v. Miller, 125 W. Va. 324, which quotes Carrico v. W. Va. C. & P. Railway, 39 W. Va. 86:
“ ‘To debar a plaintiff from recovery of damages for an injury from negligence, his negligence must be the proximate cause of the injury. When both parties are changeable with negligence, the plaintiff cannot recover if his negligence contributed in any degree to his injury; * * *
“ * * we no£ apply the rule of comparative negligence in this state, by apportioning between the plaintiff and defendant the effect of the negligence of each one in producing the injury and finding in favor of the less negligent.’ ”
Dale G. Casto v. Charleston Transit Co., 120 W. Va. 676, quotes Keller v. N. & W. Ry Co., 109 W. Va., 522:
“ ‘When a plaintiff is negligent and his negligence concurs and cooperates with that of the defendant, as a proximate cause of the injury complained of, he cannot recover.’ ”
*57 And in the Casto opinion, supra,
“Whatever the surroundings, whether urban or rural, if the situation is such that a traveler, in the exercise of reasonable care, should look for impending danger, he must look efficiently, and not carelessly or perfunctorily.”
The respondent’s conduct in leaving, a deep break or slide at the edge of hard surface portion of the road and failing to keep and maintain said portion in a reasonably safe condition for travel may have constituted negligence which, in other circumstances, would have afforded grounds for an award, but, for reasons of the deceased’s conduct already set forth, we feel that such is not the condition in this'case. We feel that the claimant’s husband concurred and cooperated with the respondent in the accident which caused his death. Therefore, we deny an award and dismiss the claim.