**INDIAN TOWING COMPANY, Incorporated, as owner of THE M/V CHEROKEE, Libellant,**

v.

**THE M/V SUWANNEE, her engines, tackle, apparel, etc. and River Transit Company, Respondent.**

**No. 2534.**

United States District Court
E. D. Louisiana, New Orleans Division.
April 2, 1956.

Deutsch, Kerrigan & Stiles, Lansing L. Mitchell, New Orleans, La., Proctors for libellant.

Lemle & Kelleher, George B. Matthews, New Orieans, La., Proctors for respondent.

J. SKELLY WRIGHT, District Judge.

This libel in admiralty is based on a collision between the M/V Cherokee, a converted United States Navy YMS, and a barge in tow of the M/V Suwannee, after daylight on the morning of June 29, 1953, in the Gulf Intracoastal Waterway, just east of Catfish Point, in Lake Borgne, Louisiana. The Cherokee alone sustained damage for which her owner makes claim in this action.

The M/V Cherokee was a wooden vessel, approximately 125′ in length, beam of 25′, depth of 11.6′ and a draft of 8 to 9′. Her twin screws were propelled by two 625 HP General Motors diesel engines which were pilothouse controlled. On the voyage in question she was manned by a crew of six and was in all respects seaworthy.[1] The M/V Suwannee was an Army-type single screw tug, 85′ in length, with a steel hull, powered by a 660 HP Superior diesel engine which was engine room controlled by bell and whistle signals from the pilothouse. Her crew consisted of six men. The Barge Coastal No. 7, measuring 240′ in length by 50′ in beam with a draft at the time of 8′, was fully loaded with petroleum products. On the morning in question, it was made up to the Suwannee forward of her bow with cables and ratches, forming a rigid unit or integrated tow.

When the vessels first came in sight of each other, the Cherokee was proceeding west, the Suwannee east, in a straight reach of the waterway. The Cherokee was on the north side of the dredged channel through Lake Borgne, navigating at a speed of approximately six miles per hour over the ground. The Suwannee, proceeding at eight miles per hour, was flanking across the channel, a

---

1. One of the Cherokee's engines was inoperative, but this condition did not detract from her seaworthiness.

short distance east of Catfish Point in the area where the Rigolets [2] sweeps into Lake Borgne, diagonally across the dredged channel from northwest to southeast. At the time a heavy tide was running out of the Rigolets and the Suwannee was holding the head of her tow up to the northeast in an effort to counteract the effect of the tide, and thereby stay in the channel. The 150' dredged channel, which runs generally east and west, is marked on either edge by a line of buoys and an appropriately placed range on Catfish Point marks the center of the channel. The weather was clear, visibility was good and there was little or no wind.

When the Cherokee was approximately 400 yards from the Suwannee's tow, she sounded a one-blast signal for port-to-port passing.[3] There was no reply. The Cherokee continued on, angling toward the extreme north edge of the channel in order to give the Suwannee as much of the dredged cut as possible. The Cherokee realized that the Suwannee had to hold the head of her tow up to the northeast in order to overcome the effect of the Rigolets current, but anticipated that as the vessels closed, the Suwannee would allow the head of her tow to fall off to the south to make passage room in the channel for the Cherokee.

The Suwannee, however, continued to flank across the channel until the head of her tow reached the northern edge. When the vessels were within 400 feet of each other, the Cherokee sounded the danger signal, put her rudder hard right and thereafter reversed her engine at full speed. This maneuver, however, merely opened the port side of the Cherokee to collision with the tow of the Suwannee. The Suwannee and her tow, sounding no signals at any time, continued to bear down on the Cherokee, and the port bow of the Barge Coastal No. 7 struck the Cherokee amidship on the port side, crushing her hull. The collision occurred on the extreme north edge of the dredged cut. The Cherokee immediately began to make water and was subsequently beached on a spoil bank to the north of the channel.

As is customary in cases of this kind, the testimony of the witnesses from each vessel is irreconcilable. The Cherokee's witnesses testified to the facts which this court has found. The witnesses of the Suwannee placed the Cherokee outside the channel to the south when first sighted, suggesting that the Cherokee was navigating the wrong range, and that on approaching shoal water, the Cherokee turned abruptly to starboard and crossed the bow of the Suwannee's tow in the south side of the channel.

This discrepancy in the testimony of the crews of the two vessels was resolved by the testimony from the pilot of the M/V Frank B. Durant, which was navigating in the same direction one-half mile ahead of the Cherokee on the morning in question and which had passed the Suwannee and her tow just after the Suwannee emerged from the land cut at Catfish Point a few minutes before the collision. This witness testified that after the Frank B. Durant passed the Suwannee, the Suwannee and her tow came under the influence of the Rigolets current and that in order to overcome the effect of that current, the Suwannee put the head of her tow up to the north and began flanking across the channel. This witness testified that the Cherokee at the time was proceeding on the north side of the channel a half mile astern of the Durant and that he realized when the Suwannee began her maneuver athwart the channel, the Cherokee was in danger. The testimony of this witness proves that the witnesses from the Suwannee are unworthy of belief and that the testimony of the Cherokee's witnesses should be credited.

Libellant contends that the collision was caused by the failure of the Suwannee to allow the Cherokee passage room

2. The Rigolets is a deep water natural channel connecting Lake Pontchartrain with Lake Borgne.

3. See Inland Rules, Article 25, 33 U.S.C.A. § 210, and Article 18, 33 U.S.C.A. § 203.

in the channel. It argues further that should the Suwannee's version of the accident be accepted, the Suwannee was nevertheless at fault, being the burdened vessel in a crossing situation and having failed to give way to the favored vessel.[4] The Suwannee, frustrated by the witness from the Frank B. Durant in her attempt to make a special circumstance[5] out of a meeting situation,[6] argues that, accepting the testimony of the Cherokee, the position of the Suwannee athwart the channel was obvious, that it was a condition rather than a cause of the collision,[7] and that the Cherokee should have run past the buoys outside the channel to avoid the collision.

■ The collision was caused by the pre-emption of the entire width of the channel by the Suwannee and her tow, and by the failure of the Suwannee timely to allow the head of her tow to fall off to the south to make passage room in the channel for the Cherokee. It is true that the Cherokee was unencumbered while the Suwannee was not only towing but was also fighting the Rigolets current, the effect of which would tend to set her to the south, outside the channel and into shoal water. It is understandable, therefore, that once she came under the influence of that current after meeting the Frank B. Durant, she would hold the head of her tow up to the north and flank across the channel. The Cherokee understood the predicament in which the encumbered Suwannee found herself, but the Cherokee had a right to assume that when the vessels came within reach of each other, the Suwannee would allow the head of her tow to fall off to the south to make passage room in the channel for the Cherokee. There was no reason for the Cherokee to as-

sume that the Suwannee expected her to run outside the channel into shoal water where spoil banks proliferate in Lake Borgne.

The Suwannee, pointing to the chart of the area, shows that there was water sufficient for the Cherokee outside the channel at the point of collision, and that the Cherokee should have sought this deep water outside the channel in order to avoid the collision. But the Cherokee was navigating without a chart. She was navigating on the range and by the channel markers. Moreover, when the emergency arose, her attention was riveted on the maneuvers of the Suwannee, making it impossible for her navigator to consult a chart. The navigator of the Cherokee had been aground in that very area a short time before the incident in suit. Under the circumstances, his reluctance to leave the channel was understandable. In the emergency, he was faced with the alternative of leaving the channel in an attempt to run around the Suwannee and her tow, or, as is instinctive with navigators, and as the courts have required,[8] of reversing his engines. He reversed his engines and was hit broadside. The Suwannee would condemn him therefor. If he had not reversed his engines and proceeded at the same speed under hard right rudder in an unsuccessful effort to avoid the Suwannee's tow, no doubt the Suwannee would then condemn him for not reversing his engines.

■ It is true that the Cherokee waited too long before taking emergency action to avoid the collision. But her failure in this regard should not condemn her to divide the damages. She had a right to assume, and she kept hoping, that the head of the Suwannee's tow

---

4. See Inland Rules, Article 19, 33 U.S.C.A. § 204.

5. See Inland Rules, Article 27, 33 U.S.C.A. § 292.

6. See Inland Rules, Article 18, 33 U.S.C.A. § 203.

7. Citing P. Dougherty Co. v. United States, 3 Cir., 207 F.2d 626; The Sanday, 2 Cir., 122 F.2d 325; The Cornelius Vanderbilt, 2 Cir., 120 F.2d 766; The Perseverance, 2 Cir., 63 F.2d 788.

8. The New York, 175 U.S. 187, on page 201, 20 S.Ct. 67, 44 L.Ed. 126, and cases collected.

would fall off to the south.[9] She waited and hoped too long. But the fault of the Suwannee is so obvious, it completely accounts for the collision, that it is not necessary myopically to weigh the action of the Cherokee in the emergency created by the Suwannee.[10] Any fault which does rest with the Cherokee was minor, indeed venial, compared with the grievous fault of the Suwannee,[11] which expected the Cherokee to navigate outside the channel among the spoil banks of Lake Borgne. When the Cherokee failed to come up to the Suwannee's expectation, the collision resulted. Then the Suwannee, by the testimony of her crew, sought to alter the facts of the case to cover her grievous fault.

This case is similar in some of its aspects to Compania de Maderas, etc. v. The Queenston Heights, supra. There the Star of Honduras waited too long before sounding her danger signal and reversing her engines before the oncoming Queenston Heights, which was being navigated diagonally across the Mississippi River into the path of the Star.[12] The court held that it would not apply the rule of The Pennsylvania[13] literally, that where the gross fault of one vessel sufficiently accounts for the collision, the court should not critically examine the navigation of the other in the emergency in an effort to divide the damage. Here the Cherokee, after attentively and carefully weighing the predicament of the Suwannee, made available to her the entire width of the channel, assuming that she, the Cherokee, would be allowed passage room when the vessels came within reach of each other. Perhaps, in spite of

the fact that the Suwannee sounded no signals whatever, the Cherokee should have realized sooner that the Suwannee had no intention of affording her passage room and started evasive action earlier. But this fault, if any, is minor as compared to the Suwannee's and comes within the major-minor fault rule of The Great Republic, supra, Compania de Maderas, etc. v. The Queenston Heights, supra, and The Lord O'Neill, supra.

Decree for libellant.

9. The Delaware, 161 U.S. 459, 469, 16 S.Ct. 516, 40 L.Ed. 771; Compania de Maderas, etc. v. The Queenston Heights, 5 Cir., 220 F.2d 120, 123.

10. The Victory (The Plymothian), 168 U.S. 410, 423, 18 S.Ct. 149, 42 L.Ed. 519; The City of New York, 147 U.S. 72, 85, 13 S.Ct. 211, 37 L.Ed. 84; Compania de Maderas, etc. v. The Queenston Heights, supra; Steffens v. United States, 2 Cir., 32 F.2d 206.

11. See The Great Republic, 23 Wall. 20, 90 U.S. 20, 23 L.Ed. 55; Compania de Maderas, etc. v. The Queenston Heights, supra; The Lord O'Neill, 4 Cir., 66 F. 77.

12. The District Court held the Star of Honduras at fault for waiting too long to take evasive action. Cia. De Maderas De Caibarean v. The Queenston Heights, 121 F.Supp. 280, 283. The Court of Appeals, applying the Major-Minor fault rule, condemned only the Queenston Heights.

13. The Pennsylvania, 19 Wall. 125, 86 U.S. 125, 136, 22 L.Ed. 148.